MARIO MERCADO RIERA, cuentadante, apelante y apelado, *v.* ADRIÁN MERCADO RIERA y MARÍA LUISA MERCADO RIERA DE BELAVAL, opositores, apelados y apelantes.

Núm. 8911.—*Sometido:* Enero 12, 1945. *Resuelto:* Mayo 8, 1946.

*Francisco Parra Capó* y *Pedro M. Porrata,* abogados del apelante apelado; *José A. Poventud* y *Celestino Iriarte, F. Fernández Cuyar* y *H. González Blanes,* abogados, respectivamente, de los opositores, apelados y apelantes.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

En julio 14 de 1943, dictamos sentencia en el caso de Certiorari Núm. 1517, anulando la resolución recurrida; declarando que el término del albaceazgo de don Mario Mercado Montalvo, fallecido bajo testamento en agosto 22 de 1937, caducó por ley en septiembre 1° de 1939; y ordenando al ex albacea testamentario, don Mario Mercado Riera, que procediera a entregar los bienes hereditarios a todos los herederos del finado en cumplimiento del contrato transaccional de septiembre 9 de 1938, debiendo rendir cuenta suplementaria desde octubre 27 de 1941 en que rindió la anterior, hasta la fecha de dicha entrega, para todo lo cual se le concedió un término de sesenta días. (*Mercado* v. *Corte,* 62 D.P.R. 368.)

No estuvo conforme el ex albacea y apeló de ella para ante la Corte de Circuito de Apelaciones para el Primer Circuito. En noviembre 23 de 1945 dicha Corte dictó sentencia confirmando la recurrida e imponiendo las costas al apelante.

El caso que ahora tenemos que considerar y resolver está relacionado con las cuentas del albaceazgo.

Con fecha 6 de marzo de 1940, don Mario Mercado Riera, albacea de su difunto padre don Mario Mercado Montalvo, so-

metió a la aprobación de sus hermanos y coherederos Margarita, María Luisa y Adrián Mercado Riera las cuentas finales del albaceazgo, a marzo 4 de 1940, sujetas a cuentas supletorias. En dichas cuentas figuran los frutos, rentas y otras accesiones de los bienes relictos y, además, un balance general de las cuentas convencionales de la herencia. El total de los ingresos asciende a la suma de $772,864.30 y el de las bajas y egresos efectuados a $665,704.92. El efectivo disponible en los bancos y otros valores ascendía en la indicada fecha a $107,159.38.

Los herederos Adrián Mercado Riera y María Luisa Mercado de Belaval formularon objeciones y reparos a las siguientes partidas:

1. "Restitución Casa Marina Núm. 23, $25,434.16". Alegan los herederos opositores que de acuerdo con el contrato transaccional de septiembre 9, 1938 el albacea estaba autorizado para invertir en la restitución de dicho inmueble solamente la suma de $14,200; que dicho albacea nunca fué autorizado por los herederos para incurrir en el desembolso adicional de $11,234.16; y que dicha suma adicional fué gastada por el albacea con posterioridad a su adquisición de la citada finca por virtud del referido contrato transaccional y escritura Núm. 204 de 27 de septiembre de 1938, pasada ante el notario don Fernando Zapater.

2. Partida denominada: "Ayuda a Insolventes, $5,721.52", por ser general y ambigua; por no constituir carga testamentaria ni deuda del causante; por no haber sido reconocida por los herederos en el contrato transaccional, ni haber sido autorizado el albacea para incurrir en dichos gastos. Igual objeción se formula en contra de las sumas que por un total de $10,484.75 aparecen entregadas, desde agosto, 1937 a febrero 17 de 1940, a Florencia Cora "para distribuir a distintas personas".

3. Asiento titulado "Pasivo del Causante pagado por el Albacea, $55,676.56", por ser de difícil comprobación, "ya

que no es dable determinar a qué partidas se refiere del pasivo que, según las cuentas trimestrales, aparece satisfecho''.

4. Partida titulada ''Becas a estudiantes pobres, $10,176.79'', por no ser carga testamentaria ni deuda hereditaria, ni haber sido reconocida por los herederos en el contrato transaccional; y por carecer el albacea de poder legal y de autorización de los herederos para hacer tales desembolsos.

5. Partida denominada ''Contribuciones pagadas, $15,682.33, en cuanto en ella puedan estar incluídas contribuciones pagadas después de septiembre 9, 1938, sobre la casa Calle de la Marina Núm. 23, Ponce, P. R.

6. Partida por concepto de ''intereses pagados, $36,100.64'', por haberse incluído indebidamente en dicha suma la cantidad de $16,392.25, que correspondía pagar a la sociedad ''Mario Mercado e Hijos'', sobre $161,199.77, parte de mayor suma adeudada por dicha firma al causante y después a sus herederos, de acuerdo con el citado contrato transaccional, y escritura número 204 de septiembre 27 de 1938.

7. Partida titulada: ''Pagos hechos de plazos vencidos e intereses de legatarios'', por un total de $86,250. Se impugna por las razones siguientes:

(a) Si de la cuarta parte satisfecha del principal de los legados no se ha descontado el importe de la contribución de herencia correspondiente a cada legatario y, además, las cantidades anticipadas a algunos legatarios, sin prorrateo entre los de igual calidad; y se impugna la cantidad pagada a la legataria Humbelina Ventura, si a la misma no se le ha cargado la suma de $1,593 que sin autorización de los herederos le fué entregada por concepto de semanales, hospedaje y muebles.

(b) Porque no obstante haber activo suficiente para pagar los legados y sus intereses, no se pagaron oportunamente, incurriéndose en un dispendio innecesario de intereses montante a $2,102.98.

(e) En cuanto a la cantidad de $3,550 pagada como primer plazo o intereses al llamado legatario Adrián V. Mercado Jiménez, los opositores alegan que el mismo no es un legatario y sí un beneficiario, por donación intervivos, de acuerdo con el contrato de transacción, la cual donación de $10,000 no quedó sujeta a contribución de herencia, debiendo ser pagada al padre del menor y no al tutor designado en el testamento para los legatarios sometidos a tutela.

8. Asiento titulado: "Pagos de rentas por pensiones vitalicias, $9,852.14", en lo que dicha cantidad excede de $7,350, que es la correspondiente a las cuatro legatarias de rentas vitalicias por las treinta mensualidades desde agosto 22, 1937 a febrero 22, 1940, sin que el albacea tuviera facultad o autorización para hacer pagos adicionales a dichas legatarias.

9. Las partidas de egresos designadas: (a) Pagado al Licenciado Pedro M. Porrata, por honorarios en defensa de la herencia en materia contributiva federal y estatal, $18,000; (b) Por gastos de viaje del albacea y del Lic. Porrata, de septiembre 10, 1938 y marzo 15, 1939, $12,000; y (c) gastos extras del Lic. Porrata durante su permanencia en Estados Unidos, $1,450. Se impugnan dichos desembolsos por no ser procedentes; por carecer el albacea de facultad para pagarlos sin obtener previamente la autorización de los herederos; porque no se ha acompañado una relación detallada de los alegados gastos y servicios, ni los comprobantes justificativos de los mismos; y porque dichos gastos exceden de lo establecido por los interesados en el contrato transaccional.

10. La partida de $20,000 para gastos de administración, honorarios de peritos contables, tasadores, conservación de propiedades, etc., por no haber sido autorizada por el tribunal, ni por los herederos y no haberse detallado los gastos cargados a dicha partida.

11. Partida titulada: "Honorarios del albacea, $10,257.41", porque lo convenido entre los herederos fué que el albacea

tendría derecho "a cualquier remuneración que la ley establezca en su favor", la cual debe ser previamente fijada por el tribunal; y porque de acuerdo con la ley el albacea en este caso sólo tendría derecho a unos $950, considerando el ingreso reportado en la cuenta final.

12. Partida titulada: "Contribución de herencia o intereses pagados al Pueblo de Puerto Rico por cuenta de los cuatro herederos, $129,331.64". Alegan los opositores:

(a) Que no están obligados a pagar la mitad de los $26,904.58 cobrados por el Tesorero por intereses devengados sobre la contribución de herencia, porque no obstante existir activo suficiente para atender al pago de la contribución dentro del término legal, el albacea, sin justificación para ello, no radicó a tiempo la notificación sobre defunción y herencia del testador, dando lugar con sus inexcusables dilaciones a que se obligase a los herederos al pago de intereses.

(b) Que no obstante la protesta de los opositores, el albacea pagó al Tesorero Insular la suma de $20,019.15 como contribución de herencia sobre la suma de $320,306.53; que al reportar el albacea en la notificación sobre defunción los $576,306.53, como dinero o depósito del testador en bancos, lo hizo en conflicto con lo estipulado en el contrato transaccional, en el cual se reconoció que $256,000.00 e intereses pasaron a ser de la sucesión y que "la suma de $320,306.53 e intereses. . . ha sido y es de la exclusiva pertenencia de la sociedad Mario Mercado e Hijos; y que por las razones expuestas los opositores no deben ser obligados a pagar la mitad de dicha suma de $20,019.15 pagada indebidamente por intereses".

13. Partida designada como baja, así: "Libreta Núm. 2281 en el Banco de Ponce, inventariada indebidamente, $325.81". Se impugna por haberse hecho figurar en el activo de la herencia y carecer de facultad el albacea para cancelarla como baja, sin intervención judicial o autorización de los herederos.

En junio 7 de 1940, los herederos opositores radicaron las siguientes objeciones adicionales:

(a) Que en las cuentas finales del albacea no se ha incluído la suma de $45,359.50 facilitada en préstamo por el finado a la sociedad Mario Mercado e Hijos, para ser depositada, como se depositó, en el caso titulado Mario Mercado e Hijos v. Elvira Olivieri et al., Civil Núm. 310, ante la Corte de Distrito de Ponce.

(b) Que la cuenta contra la sociedad Mario Mercado e Hijos, que aparece en las cuentas finales por la suma de $413,064.63, resulta aceptada por el cuentadante en la suma de $428,600.33, según recibo de la contribución de herencia.

(c) Que no se asienta en la cuenta final la suma de $6,841.06 dejada por el causante en la sociedad Mario Mercado e Hijos y que fué el beneficio por un mes y veinte días correspondiente al testador a su fallecimiento en agosto 22 de 1937.

(d) Que aun cuando en las cuentas figuran algunos cargos por pagos para legalizar el cobro de pólizas de seguro de vida del causante, entre los ingresos del albaceazgo no aparece suma alguna procedente del cobro de pólizas, que deben montar a no menos de $7,689.20.

(e) Que en las cuentas de beneficios pendientes de pago por el Bazar Atocha existe una diferencia a favor de la Sucesión de $400.26.

(f) Que en los libros de Mario Mercado e Hijos existe un crédito en favor de la Sucesión, titulado "Fondo Panteón de Familia", por $5,250, que no aparece asentado en las cuentas impugnadas.

En su contestación el ex albacea levantó en primer término la defensa de falta de jurisdicción: (1) por no haber cuentas radicadas que puedan ser objeto de impugnación, no habiéndose hecho la radicación en atención a lo convenido entre los herederos en el Contrato Transaccional de septiembre 9 de 1938; y (b) por haberse convenido en dicho contrato que no se acudiría a la autoridad judicial hasta tanto se tratara

de llegar a un acuerdo amistoso entre los herederos, el cual requisito no ha sido cumplido.

Contestando las oposiciones formuladas contra las partidas arriba relacionadas, el ex albacea alegó, en síntesis, lo siguiente:

1. Que de acuerdo con el contrato transaccional, él tenía autorización para hacer las erogaciones que hizo en relación con la "restitución" de la casa Calle Marina Núm. 23; y que los gastos en exceso de $14,200 fueron hechos en cumplimiento de un contrato entre el testador y el ingeniero Rivera para la restauración de dicha casa, la cual era poseída por el causante en usufructo.

2. Que los pagos a personas físicamente incapacitadas, fueron hechos para cumplir compromisos y órdenes expresas del causante; y que en las cuentas trimestrales rendidas a los herederos, el albacea les dió siempre la información necesaria en relación con cada partida.

3. Que las partidas del asiento "Pasivo del Causante pagado por el albacea, $55,676.56", pueden ser fácilmente comprobadas por la mera lectura de las cuentas trimestrales rendidas a los opositores durante el período de noviembre 30, 1937 a febrero 17, 1940.

4. Que los pagos de becas a estudiantes pobres fueron hechos en cumplimiento de la voluntad expresa del causante y del compromiso contraído por el testador con dichos estudiantes, para ayudarles con el importe de sus gastos hasta que terminaran sus carreras; y que el haber faltado en dichos pagos hubiese causado perjuicios irreparables a los jóvenes estudiantes.

5. Que el albacea fué expresamente autorizado por el contrato transaccional para pagar las contribuciones correspondientes a la casa de la calle Marina Núm. 23.

6. Que a los herederos corresponde pagar íntegramente la suma de $36,100.64 cargada por intereses pagados. Dicha suma se compone de intereses sobre $161,199.17 adeudados

por el causante—y no por Mario Mercado e Hijos—y sobre el resto del pasivo que figura en el inventario de la herencia. Los pagos, según se alega, fueron hechos de acuerdo con el contrato transaccional.

7. (a) Que al hacer el pago a los legatarios, el albacea siempre descontó a cada uno la parte que le correspondía para el pago de la contribución de herencia e intereses.

(b) Que es errónea la afirmación de que el albacea tuviese dinero disponible para pagar los legados antes de las fechas en que los mismos fueron pagados; y, además, que la controversia con el Gobierno Federal con respecto a la herencia del causante, impidió la aplicación del activo del caudal al pago del pasivo, hasta la resolución de dicha controversia en marzo 9 de 1939.

(c) Que de acuerdo con el contrato transaccional (cláusula 3ra., inciso (j), párr. 2) "los diez mil ($10,000.00) dólares consignados en el inventario para el menor hijo de don Adrián Mercado Riera, estarán sujetos a las mismas condiciones a que se hallan afectos los legados hechos a nietos y biznietos en el testamento".

8. Que los pagos a las legatarias Florencia Cora, Rosa Arce, Josefina Oquendo y María N. Delgado, de todo lo devengado hasta febrero 22 de 1940, fueron hechos de acuerdo con los términos del contrato transaccional; y que a cada una de ellas se le descontó lo que le correspondía pagar como contribución de herencia.

9. Que el albacea estaba autorizado por el contrato transaccional y por la ley para pagar los honorarios del Licenciado Porrata y los gastos de viaje de éste y del albacea. Que los gastos extras del Lic. Porrata fueron necesarios e indispensables para evitar gastos y pérdidas al caudal hereditario, tales como una suma cuantiosa por concepto de contribución de herencia federal; y, además, que dichos gastos estaban autorizados por el contrato transaccional.

10 y 11. Que la suma de $10,257.41 cobrada por el albacea es justa y razonable y es la que de acuerdo con la ley le co-

rresponde cobrar sobre el total de $1,098,241.28 recibido por él hasta la fecha en que rindió sus cuentas; y que el contrato transaccional le autorizó para hacerse el pago de la remuneración concedida por la ley.

12. Que la tardanza en efectuar el pago de la contribución de herencia insular se debió a que el Gobierno Federal pretendió cobrar contribución de herencia federal, no solamente sobre los $200,000 depositados en el National City Bank, en New York, si que también sobre el resto del caudal hereditario situado fuera de Estados Unidos continentales; y que por ese motivo se hizo indispensable permanecer en los Estados Unidos hasta obtener, como se obtuvo, en marzo 9 de 1939, una sentencia favorable a los herederos.

Que en septiembre 19, 1939 el albacea apeló para ante la Junta de Revisión e Igualamiento en contra de la contribución impuesta por el Tesorero; que como resultado de esas gestiones los herederos todos resultaron beneficiados considerablemente, en una suma mayor que la que hubieron de pagar por intereses.

Alega el ex albacea, que él procedió correctamente al pagar la suma de $20,019.15, como contribución de herencia sobre los $320,306.53, que formaban parte de los $576,306.53 que figuraban a nombre del causante en diversos bancos, por las razones siguientes:

(a) Porque de acuerdo con el contrato transaccional, dicha suma de $320,306.53 debía ingresar, como ingresó, íntegramente a iniciar el fondo de reserva de la sociedad Mario Mercado e Hijos.

(b) Porque los herederos protestantes fueron oportunamente notificados de que en la notificación de defunción hecha al Tesorero se había declarado la cantidad total de $576,306.53; y dichos herederos no radicaron protesta alguna ante el Tesorero, ni tampoco establecieron recurso de alzada cuando fueron notificados de que el Tesorero había impuesto la contribución sobre la totalidad de dicha suma. Se alega que di-

chos herederos están ahora impedidos de reclamar al albacea la cantidad pagada al Tesorero.

13. La suma de $325.81 que apareció en la libreta núm. 2281 del Banco de Ponce fué reclamada por un tercero y se comprobó que dicha suma no pertenecía al caudal hereditario y sí al reclamante. El albacea notificó esta baja a todos los herederos y al Tesorero de Puerto Rico.

Termina la contestación con súplica de que se desestime la oposición por estar ésta dirigida contra unas supuestas cuentas finales que aún no han sido radicadas; y, además, porque de acuerdo con el contrato transaccional el albacea no está obligado a radicar en Corte las cuentas finales hasta que los herederos no puedan llegar a un acuerdo amistoso dentro de los cinco días de ser requeridos por uno cualquiera de los firmantes. Se alega que la oposición fué radicada prematuramente y que procede su desestimación.

La vista comenzó el 14 de octubre de 1940 y consumió numerosas sesiones de la corte inferior, habiéndose celebrado la última el 27 de mayo de 1941, fecha en que el caso quedó sometido a la resolución del tribunal.

En febrero 19 de 1942, la corte inferior dictó una "Resolución o Auto Definitivo", aprobando la Cuenta Final presentada por el albacea testamentario, con las siguientes modificaciones y alteraciones:

"(A).—La partida de la Cuenta Final, titulada 'Restitución Casa Marina Núm. 23, $24,434.16' debe ser rebajada a la cantidad de $14,200.

"Se ordena que el Albacea restituya *al activo* de la Cuenta Final la suma de $11,234.16, con el interés legal del 6 por ciento anual sobre dicha suma, desde febrero 29 de 1940.

"(B).—La partida de la Cuenta Final titulada *'Contribuciones pagadas ($15,682.33)' debe ser rebajada en la cantidad de $56.66,* la que debe restituir el Albacea *al activo* de la Cuenta Final.

"(C).—La partida de la Cuenta Final titulada *'Intereses* pagados ($36,100.64)', *debe ser rebajada en la suma de $16,392.25;* debiendo el Albacea restituir esta última cantidad *al activo* de la

Cuenta Final, con intereses sobre dicha suma al 6 por ciento anual, desde marzo 4 de 1940 en que se cerró la Cuenta Final.

"(D).—En la partida de la Cuenta Final sobre *Pagos hechos de plazos vencidos e intereses de legatarios*' ($86,250) la Corte hace las siguientes modificaciones y alteraciones:

"En cuanto a la legataria Humbelina Ventura se refiere, (Apartado (A) Impugnación 7a.) debe rebajarse de la referida partida la suma de $125.35, la que debe restituir el Albacea al activo de la Cuenta Final.

"En cuanto al apartado (B) de la Impugnación 7a. o sea 'Sobre dispendio innecesario de intereses, etc.' *debe rebajarse* de la partida impugnada la suma de $2,102.98, la que debe restituir el Albacea al activo de la Cuenta Final.

"(E).—En la partida de la Cuenta Final titulada *'Pagos de Rentas por Pensiones Vitalicias* ($9,852.14), *debe rebajarse la cantidad de $2,052.14,* la que debe restituir el Albacea *al activo* de la Cuenta Final.

"(F).—En cuanto a las partidas de la Cuenta Final por '*Gastos de viaje y extras a Estados Unidos del cuentadante* (el Albacea) y Pedro M. Porrata (abogado), montantes a $13,450 y la de $18,000 *por honorarios del abogado* Pedro M. Porrata', la Corte hace las siguientes modificaciones y alteraciones:

"La partida *por gastos de viaje y extras* del Albacea y su abogado a Estados Unidos, la Corte la aprueba únicamente en la suma conjunta de_____ $3,140.00
más gastos de *transportación,* conjuntamente_____ 810.00

Total_____ $3,950.00

"En cuanto a los honorarios del abogado Ldo. Pedro M. Porrata, los aprueba únicamente en la suma de $4,000. Gran total $7,950.

"Debe rebajarse de la totalidad de las partidas de la Cuenta Final mencionadas la suma total de $23,500, la que debe el Albacea restituir *al activo* de la Cuenta Final.

"(G).—Con respecto a la partida de la Cuenta Final sobre '*Gastos de Conservación, misceláneos y administrativos etc.* ($20,000.00)', la Corte resuelve que, de dicha partida *debe ser rebajada la cantidad de $10,664.95,* la que debe restituir el Albacea *al activo* de la Cuenta Final.

"(H).—De la partida de la Cuenta Final por '*Honorarios del Albacea ($10,257.41) debe ser rebajada la cantidad de $7,208.11,* la que debe restituir el Albacea *al activo* de la Cuenta Final.

"(I).—En relación con la partida de la Cuenta Final titulada 'Contribución de Herencia e intereses pagados al Pueblo de Puerto Rico por cuenta de los cuatro herederos, $129,331.64', se ordena que el Albacea restituya *al activo* de la Cuenta Final para los opositores Adrián y María Luisa Mercado Riera, las siguientes cantidades, con interés legal, a saber:

'Por *intereses* pagados sobre la contribución de herencia _____ $13,452.29
'Por contribución de herencia sobre dineros pertenecientes a la Sociedad Mario Mercado e Hijos_____ 20,019.15

En total _____ $33,471.44

"(J).—En cuanto a la partida de la Cuenta Final titulada *'Libreta Núm. 2281, en el Banco de Ponce, inventariada indebidamente, $325.81'*, la Corte ordena que el Albacea restituya *al activo* de la Cuenta Final la cantidad íntegra de *$325.81*.

"(K).—La Corte ordena que el Albacea ponga en la Cuenta Final la suma de *$428,600.33* en lugar de la cantidad de $413,064.63 que aparece en la Cuenta Final como *'crédito* del causante contra la Sociedad Mario Mercado e Hijos.'

"Y que, también ponga en la Cuenta Final la cantidad de $6,841.06, en lugar de la suma de $4,942.04 que aparece en la Cuenta Final como *'beneficios* del causante por un mes y veintidós días, correspondiente al año 1937 a 1938'."

Tanto el ex albacea como los herederos opositores apelaron para ante este Tribunal. En los autos elevados a esta Corte aparece una transcripción de la evidencia que cubre 2838 páginas y una transcripción de la prueba documental que consta de 855 páginas más. Si a esto agregamos 320 páginas de los dos alegatos radicados por el albacea y 561 de los dos de los opositores, se verá que no ha sido fácil la tarea de extraer de esa montaña de papel las muy sencillas cuestiones envueltas en esta larga y al parecer interminable disputa.

Consideremos primero el recurso interpuesto por el ex albacea, el cual se basa en veinte señalamientos de errores que se imputan al tribunal sentenciador.

■ Como primer señalamiento se alega que la corte inferior erró al no resolver que la oposición a las cuentas no aducía hechos suficientes para constituir causa de acción y al declararse con jurisdicción para conocer del caso.

Por la cláusula Tercera, inciso (g) del Contrato Transaccional de septiembre 9 de 1938, los herederos contratantes estipularon lo siguiente:

"(g) Los frutos, rentas y productos o cualesquiera otras accesiones de los bienes relictos, serán objeto de la correspondiente rendición de cuenta final por el albacea a los demás herederos, y el saldo que resultare será distribuído por cuartas partes entre los susodichos cuatro herederos del causante.

"Si con respecto a cualesquiera partidas o extremos relacionados con dichas cuentas finales que, desde luego, comprenderán todas las trimestrales y que deberán rendirse dentro de los quince días siguientes a este otorgamiento, surgiere oposición o contienda por parte de cualquier coheredero interesado, de no poderse llegar a un acuerdo amistoso dentro de los cinco días de ser requeridos por uno cualquiera de los firmantes, se someterán las discrepancias o controversias a la autoridad judicial correspondiente."

Sostiene el albacea apelante, quien es también heredero del causante, que no apareciendo del escrito de oposición que los herederos opositores cumplieron con la "condición precedente" de requerir a los otros dos coherederos y al albacea, para tratar de llegar a un acuerdo amistoso dentro de los cinco días siguientes al del requerimiento, dicho escrito de oposición no alega hechos suficientes para constituir una causa de acción o una "justiciable controversy" que pudiera ser sometida a la decisión de un tribunal de justicia; y que, tratándose de una condición precedente, que es "consideración y motivo impelentes para las partes obligarse en la forma en que lo hicieron", ninguna de las partes puede invocar la jurisdicción de un tribunal sin alegar el previo cumplimiento de dicha condición.

En el escrito de oposición, fechado, notificado y radicado en la corte inferior en marzo 16 de 1940, los opositores alegan:

"XVI. Conforme al referido contrato de septiembre 9, 1938, cláusula 3ra., inciso (g), párr. 2do., quedan requeridos los coherederos Mario y Margarita Mercado Riera para que, dentro de los cinco días de haber sido notificados de este escrito de oposición, se sirvan significar a los opositores su conformidad o proposición, así como cualesquiera explicaciones, si las tuvieren, que permitan colegir la posibilidad o no de llegar a un acuerdo, a los fines de, en caso contrario, someter las discrepancias a la autoridad judicial correspondiente."

Arguye el apelante que el requerimiento que se hace en el párrafo XVI, supra, no puede ser considerado como un cumplimiento de la mencionada condición precedente, primero, porque dicho requerimiento ha sido hecho después de haber los opositores recurrido a la autoridad judicial y sin dar a los requeridos el plazo estipulado de cinco días, para llegar a un acuerdo amistoso, antes de acudir a la vía judicial; y, segundo, porque el requerimiento no fué dirigido al albacea, como cuentadante.

Replican los opositores apelados que de acuerdo con la citada cláusula del contrato transaccional, el albacea debió rendir la cuenta final en septiembre 24 de 1938, o sea quince días después del otorgamiento del contrato, y no la rindió hasta un año y seis meses después, ó sea en marzo 6 de 1940; que no pudo obtenerse el acuerdo amistoso dentro de los cinco días del requerimiento, ni tampoco un mes y medio después, a fines de mayo de 1940, cuando los interesados celebraron una reunión para tratar de llegar a un acuerdo, sin conseguirlo; que el albacea apelante, sin protesta alguna, asistió a dicha reunión; que después de esa reunión infructuosa, las discrepancias entre las partes estaban listas para ser sometidas a la autoridad judicial correspondiente, de acuerdo con el contrato; que los opositores pidieron señalamiento para la vista del caso y el albacea se opuso por las razones ya expuestas, pero en septiembre 6, 1940 el albacea, a través de su abogado, retiró las objeciones y se dispuso a discutir en su fondo la oposición a las cuentas finales; y que al así actuar, el apelante renunció y quedó para lo sucesivo impedido de hacer valer

sus objeciones. Alegan además los opositores apelados, que el cuentadante no podía haber sido requerido como albacea, porque en la fecha en que se hizo el requerimiento (marzo 16, 1940) ya él había dejado de ser albacea, por haber expirado el albaceazgo en septiembre 1, 1939 (62 D.P.R. 368), razón por la cual se le requirió como heredero y no como albacea.

Estamos de acuerdo con los apelados en que la corte inferior no cometió el error que se le imputa en este señalamiento. Aun cuando aceptáramos que el compromiso de hacer un esfuerzo para llegar a un acuerdo amistoso, antes de someter las discrepancias o controversias a los tribunales, sea una condición precedente, tendríamos que resolver, como resolvemos, que el albacea cuentadante está impedido de levantar esa cuestión, primero, por no haber él cumplido con el compromiso que contrajo por virtud de la misma Cláusula Tercera, inciso (g), supra, de rendir las cuentas finales del albaceazgo dentro de los quince días siguientes al otorgamiento del contrato transaccional; y, segundo, por haber renunciado a esas objeciones al ser llamado el caso para la vista de las discrepancias. Creemos, además, que los herederos opositores cumplieron substancialmente con la alegada condición precedente, pues desde el 16 de marzo de 1940, fecha en que los opositores notificaron su oposición a las cuentas y requirieron al albacea para tratar de llegar a un arreglo amistoso, y el 27 de marzo de 1940, fecha en que el albacea radicó su contestación, transcurrieron once días durante los cuales el albacea tuvo amplia oportunidad para tratar de arreglar el asunto amistosamente y evitar el tener que someterlo a la decisión en la vista que comenzó el 13 de noviembre de 1940.

■■ El segundo error que se imputa a la corte sentenciadora es el de haber sostenido que el albacea tenía que llevar el peso de la prueba durante el procedimiento de rendición y aprobación de cuentas.

Del récord taquigráfico aparece que después de declarar sin lugar la suspensión de la vista, solicitada por el albacea, el juez requirió a éste, como cuentadante, para que presentase su prueba e inmediatamente y sin objeción alguna su abogado ofreció en evidencia los "exhibits" que se habían acompañado a las cuentas trimestrales rendidas a los herederos. Habiéndose hecho objeción a muchos de los exhibits, por no haberse identificado las firmas, insistió el abogado del albacea en que se suspendiese la vista hasta que el albacea, quien se encontraba enfermo en Washington, pudiese comparecer ante la Corte para identificar las firmas y justificar la validez de los exhibits presentados. La Corte ordenó la suspensión hasta el 12 de noviembre de 1940.

Al comenzar la vista en la indicada fecha, insistió el abogado del albacea en que era a los impugnadores de las cuentas a quienes correspondía, en primer lugar, establecer y mantener su impugnación; o sea, que el peso de la prueba recaía en este caso sobre los herederos impugnadores. Sostuvo la representación del albacea cuentadante, apoyándose en los artículos 587 a 590 del Código de Enjuiciamiento Civil, Ed. 1933 y en *Vázquez* v. *Sosa*, 16 D.P.R. 491, que al exigir que tanto las cuentas trimestrales como las finales estén respaldadas por el juramento del albacea y acompañadas de los correspondientes comprobantes, el legislador quiso dar a dichas cuentas una autenticidad *prima facie*, de manera que, salvo impugnación en contrario, deberán ser tenidas por correctas a todos los fines legales; y que cuando las cuentas están respaldadas por el juramento del albacea, el impugnador que quiera destruir la presunción de autenticidad tiene que aportar prueba al efecto.

Los herederos impugnadores arguyeron en contrario que de acuerdo con el artículo 588 del Código de Enjuiciamiento Civil, "cuando el albacea o administrador haya terminado la liquidación de los bienes, renuncie o sea separado, o por cualquier otra causa cese en el desempeño de su cargo, de-

berá presentar a la Corte una cuenta final jurada"; que no estando jurada la cuenta final rendida por el albacea en este caso, no existe ninguna presunción legal que pueda ser considerada como evidencia prima facie de su corrección; que de acuerdo con la jurisprudencia[1], en el procedimiento especial sobre aprobación de las cuentas de un albacea, éste es la parte actora y el opositor es la parte demandada, ocupando la cuenta final—que debe estar jurada a los fines de que pueda ser considerada, prima facie, como correcta en cuanto a los cálculos, pero no en cuanto a las partidas—el lugar de la demanda, y la impugnación de las cuentas el lugar de la contestación.

Replicó el albacea, admitiendo que la cuenta final presentada por él a los herederos impugnadores no estaba jurada, y alegó: que dicha cuenta fué rendida de acuerdo con lo estipulado en el contrato transaccional; que no fué el albacea y sí los impugnadores quienes radicaron dicha cuenta final ante la Corte; que esas cuentas son copia fiel y exacta de la cuenta final que el albacea hubiera presentado a la Corte, faltándole únicamente la formalidad del juramento; y que si la Corte cree que el juramento es necesario, el albacea está dispuesto a jurar la copia que aparece en los autos.

La corte inferior tuvo ante sí un caso en que ni la cuenta final del albacea, ni las oposiciones de los herederos, habían sido juradas.

En *Boerman* v. *Herederos de Boerman,* 52 D.P.R. 611, después de haber dictado la Corte de Distrito una sentencia final declarando que la administración de los bienes del finado Boerman había tocado a su fin, dicha corte, a instancia de ciertos herederos, dictó una resolución requiriendo a la administradora para que rindiera su cuenta final. Habiendo apelado la administradora de la resolución dictada

---

[1] *Succession of Planchet,* 29 La. Ann. 520. *Succession of Dougart,* 30 La. Ann. 270.

por la corte inferior en el incidente relativo a la rendición y aprobación de la cuenta final, solicitaron los herederos la desestimación del recurso por haber sido interpuesto tardiamente o sea después de haber expirado el término de diez días señalado por el artículo 295 del Código de Enjuiciamiento Civil (Ed. 1933) para apelar de una providencia dictada después de sentencia. Este Tribunal, después de citar los artículos 588, 589 y 590 del Código de Enjuiciamiento Civil([2]), se expresó así:

"De un examen de estos tres artículos se desprende que la radicación y aprobación de la cuenta final prácticamente constituye de por sí un procedimiento especial. La ley ha dispuesto que se citen todas las partes interesadas y que de ser necesario se celebre una amplia vista, y ha autorizado una apelación de lo que el mismo estatuto califica de 'auto definitivo, bien aprobando la cuenta presentada, o haciendo en ella modificaciones y alteraciones, con cargo al albacea o administrador, que el derecho y la justicia reclamen; . . . . .'

"La resolución que termina la administración judicial pone fin a las actividades del administrador, más es la resolución aprobatoria de la cuenta final la que definitivamente releva al administrador o administradora de su responsabilidad oficial. . . .

---

([2])"Artículo 588.—Cuando el albacea o administrador haya terminado la liquidación de los bienes, renuncie o sea separado, o por cualquier otra causa cese en el desempeño de su cargo, deberá presentar a la corte una cuenta final jurada, y acompañada de los recibos y resguardos correspondientes, la cual también se pondrá de manifiesto para su inspección. Al presentarse dicha cuenta final, se citará a todas las partes interesadas en el caudal, a fin de que puedan presenciar la liquidación final de sus cuentas, y se les devuelva o cancele la fianza que hubieren prestado.

"Artículo 589.—Si pasados ocho días después de presentada la citación decretada por un juez de dicha corte, ninguna de las partes hubiese hecho oposición a las cuentas, la corte de distrito si en su opinión dichas cuentas son justas y correctas, dictará auto aprobándolas y declarando exento de responsabilidad al administrador; y cancelará la fianza que hubiere constituído. Si las cuentas fueren impugnadas, se sustanciará la impugnación y se admitirán pruebas en una vista del caso y se aprobarán o desaprobarán aquéllas según el resultado de la vista.

"Artículo 590.—La corte de distrito dictará auto definitivo, bien aprobando la cuenta presentada, o haciendo en ella modificaciones y alteraciones, con cargo al albacea o administrador, que el derecho y la justicia reclamen; contra dicho auto podrá interponerse recurso de apelación."

"Por tanto, somos del criterio de que la resolución apelada era un decreto final dictado en un procedimiento especial y, por ende, que la apelación fué entablada oportunamente."

Tratándose, pues, en el presente caso de un procedimiento especial con todas las características de un juicio plenario, y no habiendo sido juradas ni las cuentas finales sometidas por el albacea ni la impugnación radicada por los herederos inconformes, somos de opinión que la corte inferior no cometió el error que se le imputa en este señalamiento.

■ El tercer señalamiento presenta una cuestión que no ofrece dificultad alguna. Se queja el albacea apelante de que se le obligue a restituir las cantidades mencionadas en la sentencia recurrida, como si los cuatro herederos hubiesen reclamado, cuando solamente dos de ellos han impugnado las cuentas. La única interpretación razonable de la sentencia es que el albacea deberá devolver al caudal hereditario las sumas que de acuerdo con la sentencia hubiere gastado indebidamente. Al hacerse el pago definitivo a los herederos, cada uno de éstos, tanto los opositores como los que no impugnaron las cuentas, tendrán derecho a recibir una cuarta parte de la suma total devuelta al caudal hereditario.

■ ¿Erró la corte inferior al negar su aprobación, como egreso correcto del caudal hereditario, al gasto de la suma adicional de $11,234.16 invertida en la restauración de la casa "Marina Núm. 23"? Esa es la cuestión envuelta en el cuarto señalamiento.

De acuerdo con los términos del Contrato Transaccional de septiembre 9, 1938 (Cláusula 1ª., inciso (1)), la casa "Marina 23" fué adjudicada al heredero Mario Mercado Riera, el albacea apelante, reconociendo los herederos contratantes, *como egresos correctos del caudal hereditario,* la suma de $14,200 que hasta esa fecha había sido invertida por el albacea en la restauración de dicho inmueble. De la prueba

resulta, que con posterioridad a la fecha en que le fué adjudicada dicha casa, el albacea continuó las obras de restauración hasta febrero 29 de 1940, invirtiendo la suma adicional de $11,234.16, que es la que impugnan los herederos opositores.

La decisión de la corte inferior es a nuestro juicio correcta. El heredero Mario Mercado aceptó, al firmar el contrato transaccional, como parte de su porción hereditaria, una casa parcialmente restaurada, en la cual se había invertido con la aceptación de todos los herederos la cantidad de $14,200. Desde ese momento dicho heredero pasó a ser dueño en pleno dominio de la casa y de la suma en ella invertida. No encontramos en el Contrato Transaccional ni en la evidencia practicada, que los herederos contrajeran compromiso alguno de sufragar los gastos adicionales que el nuevo dueño del inmueble se viera precisado a hacer hasta dejar la casa totalmente restaurada.

■ Tampoco erró la corte sentenciadora al declarar con lugar la oposición a la partida de $56.66, cargada por el albacea a los herederos, por agua consumida en la casa "Marina 23" hasta febrero 23, 1940. Habiendo sido adjudicada la casa al heredero Mario Mercado Riera en septiembre 9, 1938, era a él a quien correspondía pagar el agua consumida desde esa fecha en adelante.

■ La corte inferior resolvió que en la partida de $36,100.64, por "intereses pagados", el albacea había incluído indebidamente la suma de $16,392.25, la cual debía ser reintegrada al caudal hereditario. Veamos los hechos.

Al quedar disuelta y liquidada la sociedad de gananciales entre don Mario Mercado y Montalvo y su difunta esposa, los cuatro hijos y herederos de ésta pasaron a ser dueños de la suma de $161,199.77, representada por un crédito a favor de don Mario Mercado y de su esposa, contra la sociedad "Mario Mercado e Hijos". Por convenio entre don Mario y sus hijos, la indicada suma quedó en poder de don

Mario, usufructuariamente y con carácter vitalicio. Al fallecer don Mario Mercado Montalvo en agosto 22 de 1937, la nuda propiedad y el dominio útil de la suma adeudada por Mario Mercado e Hijos pasó a los cuatro herederos de la causante, doña Eufemia Riera Dubocq.

La corte inferior resolvió que es a la sociedad Mario Mercado e Hijos a quien corresponde pagar los $16,392.25, por intereses sobre la suma por ellos adeudada a los herederos. Sostiene el albacea que dicha resolución es errónea:

(a) Porque en la escritura de enero 13 de 1927, sobre división y adjudicación de la herencia de doña Eufemia Riera Dubocq, no se consignó pacto alguno sobre intereses a devengar por el mencionado crédito.

(b) Porque de acuerdo con el Contrato Transaccional de septiembre 9, 1938 (cláusula 1ª, inciso (c)) el referido crédito, que fué adjudicado por partes iguales a los cuatro herederos, por la escritura de enero 13, 1927, "será satisfecho por cuartas partes y con interés al tipo del seis por ciento anual desde agosto 22, 1937, liquidándose dicho interés hasta la fecha, . . . . a los herederos don Adrián Mercado Riera y doña María Luisa Mercado de Belaval, *mediante sendos pagarés a sus respectivas órdenes suscritos por la entidad Mario Mercado e Hijos* que les serán entregados al firmarse la escritura a que se refiere el inciso precedente, *con cargo a los créditos que contra la última tiene hoy la Sucesión de don Mario Mercado Montalvo por $413,064.63;* etc."

La contención del albacea apelante es insostenible por ser contraria a la prueba y por estar basada en una premisa contraria a la realidad. El deudor de la suma de $161,199.77 no era don Mario Mercado Montalvo, como pretende el albacea cuentadante, y sí la Sociedad Mario Mercado e Hijos, la cual adeudaba esa suma a la sociedad de gananciales existente entre don Mario Mercado Montalvo y doña Eufemia Riera Dubocq. Al fallecer ésta, el crédito que ella y su esposo tenían contra Mario Mercado e Hijos pasó, por con-

venio entre los herederos, a don Mario Mercado Montalvo para que lo usufructuara durante su vida. Al fallecer don Mario, el crédito contra Mario Mercado e Hijos pasó a ser de la absoluta propiedad, por partes iguales, de los cuatro hijos y herederos de la difunta doña Eufemia y del causante don Mario Mercado Montalvo. Es evidente que la deudora fué siempre la Sociedad Mario Mercado e Hijos; que el causante fué condueño primero y usufructuario hasta su muerte del mencionado crédito; y que en la fecha en que se otorgó el Contrato Transaccional (septiembre 9, 1938) Mario Mercado e Hijos continuaban adeudando a los cuatro herederos de doña Eufemia el importe total del crédito.

La Sociedad Mario Mercado e Hijos fué una de las partes en el Contrato Transaccional, habiendo concurrido a su otorgamiento por representación de su socio y director gerente, don Mario Mercado y Riera, el albacea cuentandante y apelante. La prueba documental ofrecida por los herederos opositores demuestra que don Adrián y doña María Luisa Mercado Riera recibieron sendos pagarés de Mario Mercado e Hijos, en cumplimiento de lo estipulado en el inciso (c) cláusula 1ª del Contrato Transaccional; que en el montante de cada uno de dichos pagarés se incluyó interés al 6 por ciento anual desde agosto 22, 1937, día en que falleció el testador, hasta su vencimiento en diciembre 9 de 1938; y que el pagaré a la orden de Adrián Mercado Riera fué prorrogado tres veces, habiéndose pagado los intereses devengados hasta la fecha de cada una de dichas prórrogas, por la sociedad deudora, Mario Mercado e Hijos. La declaración del perito contable William A. Waymonth (T. de E. pág. 2011), demuestra claramente cuán absurda es la contención del albacea de que el contrato transaccional le autoriza para cargar a las cuentas del albaceazgo las sumas pagadas por Mario Mercado e Hijos por concepto de intereses sobre la suma adeudada por dicha Sociedad a los herederos de doña Eufemia Riera Dubocq. Para mayor claridad haremos

constar que, de acuerdo con la prueba, la Sociedad Mario Mercado e Hijos adeudaba al causante don Mario Mercado un total de $413,064.63, y que en esa suma aparece incluída la de $161,199.77 procedente de la herencia materna. Esa fué sin duda alguna la razón por la cual se estipuló en el inciso (c) cláusula 1ª del contrato transaccional, supra, que el importe de los pagarés que la Sociedad Mario Mercado e Hijos se comprometió entregar y entregó, sería cargado "a los créditos que contra la última tiene hoy la Sucesión de don Mario Mercado Montalvo por $413,064.63". Nada encontramos en dicho inciso que autorice al albacea o a Mario Mercado e Hijos a pagar los intereses devengados por los $161,199.77 en poder de Mario Mercado e Hijos, con cargo al crédito total a favor del causante y ahora de sus herederos, pues ello equivaldría a permitir que Mario Mercado e Hijos se enriquecieran injustamente pagando los intereses con el propio dinero de los acreedores. No cometió la corte recurrida el error que se le imputa.

 La corte inferior resolvió que el albacea debía restituir al caudal hereditario $125.33 adeudados por la legataria Humbelina Ventura; $2,102.93, como intereses pagados con motivo del primer pago parcial de legados; y $2,502.14 adeudados al caudal hereditario por anticipos hechos por el albacea a varios pensionistas. Alega el apelante que la resolución de la corte es errónea.

En el acto de la vista el albacea presentó en evidencia varias escrituras de cartas de pago, y declaró que todas las pensionistas ya habían pagado las cantidades que él les había anticipado, con excepción de una de ellas que adeudaba aún $938.58, suma que estaba pagando por mensualidades que se le deducían de su pensión mensual. A petición de los opositores, la corte eliminó las cartas de pago y la declaración del albacea, resolviendo "que no tiene jurisdicción, por tratarse de 'materia posterior no comprendida en las alegaciones' ". Declaró el albacea, que por ser las pensionistas per-

sonas pobres él se vió obligado a anticiparles las sumas necesarias para que pudieran pagar la contribución de herencia, evitando así un posible embargo de los bienes hereditarios.

Que el albacea está facultado para hacer anticipos a los legatarios y herederos, a cuenta de los legados o participaciones a que éstos tuvieren derecho, siempre que en el momento de rendirse la cuenta final las sumas anticipadas hayan sido devueltas al caudal hereditario, es cuestión sobre la cual no cabe dudar. 21 Am. Jur. 666, sec. 510, pág. 670, sec. 514 y pág. 633, sec. 443.

El albacea tenía derecho a probar, en el acto de la vista sobre aprobación de sus cuentas finales, el montante de los anticipos hechos por él a legatarios y herederos y las cantidades devueltas por éstos al caudal hereditario. La corte inferior erró al no admitir las cartas de pago y la declaración ofrecidas por el albacea. La orden de restitución debió limitarse a la suma de $938.58, que de acuerdo con la declaración del albacea adeudaba entonces la legataria Josefa Oquendo. Alega el albacea que dicha suma ha sido también devuelta. Resulta, pues, que tanto el error señalado y cometido en parte, como la cuestión levantada por los alegatos, resultan académicos por haberse reintegrado ya al caudal hereditario las sumas anticipadas.

La corte inferior encontró satisfactoriamente probado que del legado de Humbelina Ventura, el albacea debió deducir $1,598 en vez de los $1,472.65 que dedujo; y ordenó la restitución de la diferencia montante a $125.35. El albacea no ha expuesto razón alguna por la cual debemos alterar la conclusión a que llegó el tribunal inferior.

██ En el octavo señalamiento se imputa a la corte inferior el error de haber ordenado al albacea la restitución de $2,102.98, pagados innecesariamente sobre el primer pago a cuenta de legados.

El primer pago parcial de legados e intereses fué hecho por el albacea en mayo 23, 1939, y de acuerdo con la cuenta

final ascendió a un total de $36,250. Alegan los opositores que el albacea pudo haber hecho dichos pagos siete meses antes de la fecha en que los hizo, o sea en octubre 22 de 1938, pues para esa fecha había activo suficiente, con lo cual hubiese evitado el dispendio innecesario de la suma pagada por intereses.

En el testamento del causante se dispuso que todos los legados, con excepción del de Pastor Mandry, devengarían intereses al 7 por ciento anual una vez transcurridos noventa días del fallecimiento del testador, y serían pagaderos, la cuarta parte de cada uno de ellos "del dinero efectivo que tenga en los bancos, y el resto dentro del término de cuatro años, a razón de una cuarta parte por año". El legado del Sr. Mandry, por $100,000, devengaría interés del 4 por ciento anual.

El consentimiento de los herederos para el pago de legados, requerido por el artículo 824, núm. 2 del Código Civil, Ed. 1930, fué otorgado al albacea por la Cláusula 3ª, inciso (j) del contrato transaccional.

El albacea trató de excusar su dilación en hacer el pago, alegando (a) que en octubre de 1938 no había dinero disponible para pagar la cuarta parte de los legados y (b) que la reclamación del Gobierno Federal sobre el pago de contribución de herencia impidió la aplicación del activo de la herencia al pago del pasivo.

Las conclusiones de la corte inferior están sostenidas por la evidencia, de la cual hemos hecho un detenido examen. De acuerdo con el inventario, el activo hereditario neto asciende a $929,430.48. Del mismo inventario y de la Cuenta Final del albacea aparece que en septiembre 9 de 1938 el efectivo en los bancos y en caja ascendía a $264,894.83, ascendiendo a $413,064.63 las cantidades adeudadas a la Sucesión por la sociedad Mario Mercado e Hijos. Es evidente que en octubre de 1938 el albacea tenía en su poder fondos

más que suficientes para pagar los legados en dicha fecha y evitar el pago de intereses.

La controversia con el Gobierno Federal no puede ser considerada como razón suficiente para que el albacea se abstuviera de hacer a su debido tiempo el pago de los legados. Dicha controversia estaba limitada a la suma de $200,000 depositada en el National City Bank, en la ciudad de Nueva York, a nombre del testador. El albacea no podía disponer de esa suma, sin obtener antes el correspondiente "release" o "transfer certificate".

\* No erró la corte inferior al resolver que el albacea, como fiduciario, es responsable a los herederos por la suma pagada indebidamente. Véase: Sánchez Román, Derecho Civil, Vol. 11, página 1454.

 11, 12 y 17.—Estos tres señalamientos deben ser discutidos conjuntamente toda vez que ellos envuelven la misma cuestión. Alega el albacea apelante que la corte inferior erró:

(a) Al no admitir evidencia para demostrar que el plazo de diez días fijado en el Contrato Transaccional para el pago de la contribución de herencia, es y debe ser interpretado como una condición meramente directiva.

(b) Al no resolver que si dicha condición no era directiva, la misma era imposible de cumplir, de acuerdo con la evidencia practicada.

(c) Al compeler al albacea a restituir a los herederos Adrián y María Luisa Mercado Riera la suma de $13,452.29, o sea la mitad de los $26,904.58 cobrados por el Tesorero de Puerto Rico como recargos sobre el importe de la contribución de herencia.

Sostienen los herederos opositores que el término pactado para la notificación de defunción y pago de la contribución de herencia era de naturaleza precisa e imperativa; que su cumplimiento era posible; y que la corte a quo no erró al

ordenar la restitución de la suma innecesariamente pagada por el albacea.

La corte sentenciadora declaró probados los siguientes hechos:

Que habiendo expirado en febrero 18 de 1938 los 180 días de gracia, contados desde la fecha del fallecimiento del causante, el albacea no radicó la notificación sobre defunción del testador ni pagó la contribución de herencia hasta febrero 29 de 1940, o sea dos años y diez días después de haber expirado el término legal.

Que de acuerdo con el Contrato Transaccional (Cláusula 3ª, letra (i)), de septiembre 9 de 1938, el albacea se comprometió a radicar la notificación de defunción "dentro de los diez días siguientes a esta fecha", comprometiéndose, además, a que una vez liquidada la contribución pagaría la parte correspondiente a cada uno de los herederos y legatarios.

Que al día siguiente de firmado el contrato, el albacea se ausentó para Estados Unidos, en gestiones sobre la contribución de herencia federal, y no regresó a la Isla hasta marzo 15 de 1939; y que 49 días después de su regreso, o sea el 3 de mayo de 1939, el albacea radicó la notificación de defunción del causante. El Tesorero invirtió 115 días en liquidar la contribución, la cual fué pagada en septiembre 29 de 1939.

La corte inferior resolvió que la ausencia y permanencia del albacea en Estados Unidos "no constituyeron obstáculos insuperables para haber cumplido el albacea con la obligación que contrajo de radicar la notificación de defunción dentro del convenido término de diez días", pues aun encontrándose en Estados Unidos pudo encargar a sus subalternos, agentes o abogados que preparasen y enviasen la notificación junta con el inventario que ya había sido acordado entre todos los interesados y unido al Contrato Transaccional. (Artículo 5, "Ley Para Modificar y Ampliar la Contribución

Sobre Transmisión de Bienes por Herencia'', enmendado por Ley núm. 136 de 1939, página 673.)

El citado artículo 5 de la Ley de Contribuciones Sobre Herencias impone a todo albacea o persona autorizada para administrar bienes, el deber de ''trasmitir al Tesorero de Puerto Rico, dentro de los sesenta días siguientes a la fecha del fallecimiento de la persona a quien represente, una notificación jurada de dicho fallecimiento, haciendo constar claramente en ella el nombre y residencia del referido difunto; la fecha del fallecimiento; . . . ; y tan exactamente como sea posible el montante, valor, descripción y situación de los bienes del difunto; etc.''. El Tesorero podrá por causa justificada conceder una prórroga no mayor de sesenta días para la radicación de dicha notificación. El artículo 9 de la misma ley dispone que las contribuciones de herencia deberán ser satisfechas ''dentro de término de ciento ochenta días después del fallecimiento del causante''; y si no se pagasen dentro del expresado término, ''se cargarán y cobrarán intereses sobre ellas al tipo de 1 por ciento por cada mes o fracción de mes''.

Habiendo fallecido el causante el 22 de agosto de 1937, el término de 60 días que la citada ley concede al albacea para hacer la notificación de defunción expiró el día 21 de octubre de 1937; y el término de 180 días para pagar la contribución expiró el 19 de febrero de 1938, teniendo derecho el Tesorero desde esta última fecha a cargar y cobrar intereses al 1 por ciento mensual sobre el importe de la contribución.

En la fecha en que se otorgó el contrato transaccional, septiembre 9 de 1938, ya el albacea había dejado de cumplir con los preceptos del estatuto, imponiendo a los herederos la carga adicional de tener que pagar intereses al 1 por ciento mensual sobre el importe de sus respectivas participaciones. La corte inferior no erró al resolver que la estipulación al efecto de que el albacea ''dentro de los diez días

siguientes a esta fecha, *hará* la correspondiente notificación de defunción al Tesorero de Puerto Rico" y que una vez liquidada la herencia "pagará el albacea por cuenta de cada heredero, así como de los varios legatarios, lo que a cada uno corresponda por concepto de contribución de herencia", no era una condición meramente directiva y sí un pacto preciso e imperativo por el cual el albacea se comprometió a hacer lo que la ley le obligaba a hacer para evitar el pago de intereses.

Resultando de la prueba que el albacea tuvo en todo momento fondos suficientes para haber podido pagar la contribución de herencia; y no habiendo el albacea ofrecido una **excusa** legalmente suficiente para justificar su dilación en hacer el pago, es justo que se le imponga la obligación de devolver a los dos herederos opositores la suma de $13,452.29 que reclaman.[3]

▉▉▉ El albacea y su abogado estuvieron en los Estados Unidos, en gestiones que la corte inferior estimó como beneficiosas para la herencia, desde septiembre 10 de 138 hasta marzo 15 de 1939, o sea durante un período de 157 días. En la cuenta final del albacea aparecen cargadas a la herencia, con motivo de dicho viaje, las siguientes partidas:

(*a*) Gastos de viaje y extras_____ $13,450
(*b*) Honorarios del abogado _____ $18,000

La corte inferior, basándose en la prueba presentada por los opositores, rebajó la primera partida a la suma de $3,950, asignando al albacea y a su abogado una dieta de $10 a cada uno, durante 157 días y añadiendo al total de $3,140 de las dietas, los gastos de transportación ascendentes a $810 por los dos. No encontramos razón alguna para intervenir con

---

[3] *The Harriman* v. *Emerick*, 19 L. ed. (U.S.) 629; *Klauber* v. *San Diego Street Car Co.*, 95 Cal. 353; *Jacksonville etc. Ry. & Navigation Co.* v. *Hooper*, 40 L. ed. 515; 93 Jur. Civil Española, págs. 345, 346 a 350.

la apreciación que de la prueba hizo la corte inferior. Dicha partida queda aprobada por la suma de $3,950 concedida por la corte inferior. El albacea deberá reintegrar a la herencia la cantidad cargada en exceso, o sea $9,500 que le ordenó reintegrar la corte inferior.

■ La segunda partida fué reducida a $4,000. Convenimos con la corte inferior en que la suma de $18,000 cargada a los herederos como honorarios de abogado, por gestiones relacionadas con la contribución de herencia federal, es excesiva. Empero, creemos que la rebaja hecha por la corte inferior, de $18,000 a $4,000, es también excesiva. Considerando que el abogado Porrata permaneció en los Estados Unidos, fuera de su bufete, durante cinco meses, dedicado a la defensa de los intereses de los herederos, y que sus servicios fueron beneficiosos para la herencia, opinamos que la suma de $7,500 es una remuneración justa y razonable por los cinco meses de servicios profesionales. La partida de honorarios será elevada a $7,500, debiendo el albacea reintegrar al caudal hereditario la diferencia, o sea la suma de $10,500 en vez de la de $14,000 que se le ordenó reintegrar por la resolución recurrida.

■ En el Contrato Transaccional (cláusula 3ª, inciso (h)) se estipuló que el albacea "tendrá derecho a cualquier remuneración que la ley establezca en su favor y, además, a los gastos legales y necesarios incurridos como consecuencia del albaceazgo, los que se incluirán en la Cuenta Final, etc.".

La partida de $20,000 sobre "Gastos de Conservación, Misceláneos y Administrativos, etc." fué impugnada por los herederos opositores. La corte inferior ordenó al albacea restituir al activo de la Cuenta Final la suma de $10,664.95, importe de gastos hechos por el albacea que a juicio de la corte no eran necesarios ni podían ser legalmente cargados a la herencia.

(*a*) El cargo de $942.54 por "Custodia Quinta Abolición" fué rechazado por la corte inferior por la razón de que en virtud del contrato transaccional la mencionada Quinta pasó a ser propiedad de la heredera Margarita Mercado de Mandry en septiembre 9 de 1938 y los pagos por custodia de la finca corresponden a los años 1939 y 1940.

Alega el albacea apelante que la corte inferior erró al rechazar algunas de las partidas que integran la suma de $942.54, a saber: $367.50 pagados al guardián de la Quinta por las "70 semanas comprendidas entre el 8 de marzo, 1938 y el 30 de junio, 1938" (*sic*); $9.54 por luz de la Quinta Abolición por los siete meses entre febrero 1 y agosto 31, 1938; y dos partidas de $173.25 y $5.25 totalmente relacionadas con gastos de la custodia de la finca. Sostiene el albacea que dichas partidas, que ascienden a un total de $555.54 son gastos legítimos del albaceazgo; y que la suma a restituir por gastos de custodia de la Quinta Abolición debe ser reducida a $387.

No encontramos en el récord base alguna para sostener la contención del apelante, ni razón alguna que pueda justificar nuestra intervención con la apreciación de la prueba por la corte inferior.

(*b*) Sostiene el apelante que el tribunal sentenciador actuó erróneamente al reducir de $1,500 a $960 las reclamaciones de Indalecio Rivera y Juan V. Díaz, por servicios prestados al albaceazgo como contables. Arguyen los opositores, en contrario, que la corte inferior erróneamente asumió jurisdicción para considerar y resolver dichas reclamaciones en contra de la herencia; y que erró al no rechazarlas en su totalidad.

La corte inferior, después de considerar toda la evidencia aducida en pro y en contra de dichas reclamaciones, así como de las formuladas por los peritos José Gorbea y Julio Benvenutti, llegó, en síntesis, a las siguientes conclusiones:

(1) Que los desembolsos hechos por el albacea para el pago de honorarios a un perito tasador y tres contables, en relación con la herencia, fueron legales y necesarios para la formalización del inventario requerido por los artículos 586 y siguientes del Código de Enjuiciamiento Civil, Ed. 1933; para la preparación de las cuentas trimestrales y de la Cuenta Final del albaceazgo, de acuerdo con el artículo 587 del mismo Código; y para cumplir con los requisitos de la Ley de Contribuciones Sobre Herencias.

(2) Que las reclamaciones de Rivera y Díaz deben ser reducidas "a la suma de $960 para cada uno de ellos, a razón de $30 mensuales".

(3) Que la suma total rebajada, o sea la de $1,080, debe ser restituída al Activo de la Cuenta Final.

La evidencia en cuanto a la naturaleza e importancia de los servicios prestados por los peritos y contables es contradictoria. La corte inferior dirimió el conflicto, otorgando a los reclamantes las sumas que consideró justas y razonables, tomando en consideración la importancia de los servicios prestados y la cuantía de la herencia. No se ha aducido por ninguna de las partes contendientes una razón suficiente para que intervengamos con la decisión de la corte sentenciadora, la cual consideramos correcta.

▆▆▆▆▆ El albacea cuentadante cargó en la Cuenta Final la suma de $10,257.41, como importe de su remuneración por la administración de la herencia. La corte inferior le concedió solamente $3,049.30, ordenándole la devolución de la diferencia. Alega el apelante que la corte erró al decretar dicha reducción. Sostienen los opositores que si algún error se cometió fué el de no haber ordenado la devolución de la partida en su totalidad; que "el albaceazgo en este caso debe entenderse y fué gratuito", no siendo aplicable el artículo 586 del Código de Enjuiciamiento Civil (1933); y que si se resolviera que el albacea tiene derecho a compensación, ésta no podría exceder de la suma de $960.

Los fundamentos de la decisión del tribunal recurrido fueron, en síntesis, los siguientes:

1. En el Contrato Transaccional (Cláusula 3, letra (h)) se estipuló que el albacea testamentario "tendrá derecho a cualquier remuneración que la ley establezca en su favor".

2. El artículo 830 del Código Civil dispone que "el albaceazgo es cargo gratuito", pero que el testador podrá, sin embargo, señalar al albacea la remuneración que tenga por conveniente, pero todo ello "sin perjuicio del derecho que les asista para cobrar lo que les corresponda por los trabajos de partición u otros facultativos".

3. En el testamento en este caso no se señaló remuneración al albacea, pero tampoco se le prohibió que la recibiera.

4. Bajo tales circunstancias, el albacea tiene derecho a recibir la remuneración proporcional fijada por el artículo 586 del Código de Enjuiciamiento Civil, pero solamente por los ingresos ocurridos durante su administración.

Dispone el artículo 586 del Código de Enjuiciamiento Civil, que el albacea, "a no disponer otra cosa el testamento bajo el cual se le nombra", tendrá derecho a recibir como remuneración por sus servicios el 5 por ciento "de los ingresos que ocurran durante la administración, montantes a la cantidad máxima de mil (1,000) dólares; 2½ por ciento cuando éstos asciendan hasta diez mil (10,000) dólares; y el uno por ciento sobre las cantidades que excediesen sobre diez mil (10,000) dólares".

En el acto de la vista, el perito William A. Waymouth declaró lo siguiente:

"Según ya he expresado en mi declaración, el dinero *realmente recibido* e ingresado en los bancos asciende a $287,429.71. Computando cinco por ciento sobre los primeros mil dólares, resultan ser $50; dos y medio sobre los próximos $9,000, son $225, y uno por ciento sobre el remanente de $277,429.71, da $2,774.30, o sea un total de $3,049.30."

Alega el apelante que la corte inferior erró al resolver, de acuerdo con el texto español del artículo 586, supra, que la remuneración del albacea debe ser computada tomando como base "los ingresos que ocurran durante la administración" en vez de aplicar el texto inglés de dicho artículo, según el cual la remuneración debe computarse "on sums received in the course of administration"—sobre las sumas recibidas en el curso de la administración.

El alegado conflicto entre los textos español e inglés del citado artículo es más aparente que real. Los *ingresos* que ocurren durante la administración de un caudal hereditario no pueden ser otra cosa sino las cantidades que el albacea *recibe* en pago de créditos a favor del causante o como productos o rentas de los bienes de la herencia.

La Sociedad Mario Mercado e Hijos aparecía adeudando a don Mario Mercado Montalvo un total de $413,064.63. En dicha suma se incluyó la de $131,199.77 adeudada por la referida Sociedad a don Mario Mercado y a su esposa. Ya hemos visto al principio de esta opinión, que al fallecer la esposa de don Mario, el referido crédito fué adjudicado a los cuatro hijos, por partes iguales, en pago de su herencia materna; y que los cuatro hijos concedieron a don Mario el derecho a usufructuar dicho crédito durante su vida. Al fallecer don Mario y terminar el usufructo vitalicio, el crédito pasó a ser de la absoluta y exclusiva propiedad de los cuatro herederos de doña Eufemia Riera, sin que el albacea tuviera derecho alguno a reclamar o recibir el importe de dicho crédito, como parte del caudal hereditario del causante. Prueba de ello es que, de acuerdo con lo dispuesto en la Cláusula Primera, apartado (E) del Contrato Transaccional, el importe total de dicho crédito fué satisfecho, por cuartas partes, a los herederos Adrián y María Luisa Mercado Riera, "mediante sendos pagarés a sus respectivas órdenes suscritos por la entidad Mario Mercado e Hijos"; y a los otros dos herederos, Mario y Margarita Mercado Riera, acreditán-

doles sus respectivas participaciones en cuentas especiales y separadas en los libros de la Sociedad Mario Mercado e Hijos. Es evidente que el albacea nunca recibió ni ingresó como parte del caudal hereditario de don Mario Mercado, la cantidad adeudada y pagada por la mencionada Sociedad a los cuatro herederos de doña Eufemia Riera.

Toda la argumentación del apelante, para sostener su alegado derecho a remuneración sobre el crédito de $161,199.77, se basa en dos falsas premisas: (1) que dicha suma era parte del pasivo del causante; y (2) que esa deuda del causante fué amortizada con el importe de un crédito que el causante tenía contra una tercera persona. No erró la corte inferior al resolver que el albacea no tenía derecho a recibir remuneración sobre el importe de dicho crédito. Tampoco erró al resolver que el derecho del albacea a recibir remuneración está limitado a los ingresos ocurridos durante el curso de su administración, y que la remuneración no puede ser determinada tomando como base el valor del *corpus* hereditario. Véase: 4 Manresa, Comentarios al Código de Enjuiciamiento Civil, pág. 403; *Boerman* v. *Marrero,* 34 D.P.R. 126, 131.

 En el inventario se incluyó como parte del Activo de la herencia la cantidad de $325.81, saldo de la libreta núm. 2281 del Banco de Ponce, expedida a favor de don Mario Mercado y de don Inocencio García, de Guayanilla. Alega el albacea, que al ser requerido por Inocencio García para que le entregara el saldo de dicha libreta, él practicó una investigación y quedó convencido de que la libreta nunca fué propiedad del testador y sí de Inocencio García; y que entonces accedió a devolver los $325.81 a García, notificando a todos los interesados en la herencia y solicitando del Tesorero de Puerto Rico que diera de baja dicha suma, deduciéndola del Activo de la herencia.

Habiendo sido impugnadas las actuaciones del albacea, éste ofreció en evidencia las declaraciones de Inocencio Gar-

cía y del Sr. Rosaly, Manager del Banco de Ponce, tendientes a sostener que la suma depositada a nombre de Mario Mercado e Inocencio García era de la exclusiva pertenencia de García; que las dos firmas que aparecían en la tarjeta del Banco eran la de Mercado y la de García; que la suma depositada podía ser retirada con una u otra de las dos firmas; que don Mario Mercado acostumbraba hacer los depósitos en esa forma para mayor protección de sus empleados, como lo había sido García por más de 35 años; y que la libreta le fué entregada a García el mismo día en que se hizo el depósito, conservándola García en su poder hasta el momento en que la presentó ante la Corte.

La corte inferior resolvió que el albacea no tenía facultad para cancelar como baja el importe de la libreta, y ordenó la restitución del mismo al activo de la cuenta final, basando su decisión en las de esta Corte Suprema en *Crehore* v. *Registrador*, 22 D.P.R. 32 y *Aponte & Sobrino* v. *Sucesión Pérez*, 48 D.P.R. 449, 453.

En *Crehore* v. *Registrador*, se resolvió que un albacea, aun cuando sea administrador de la herencia, no está facultado para cancelar un crédito hipotecario constituído a favor del causante, ni para enajenar o realizar actos de riguroso dominio sobre los bienes inmuebles o derechos reales pertenecientes a la herencia, a menos que haya sido expresamente autorizado por el testador u obtenido la autorización expresa de los herederos. Se resolvió, además, que la autorización concedida por la Corte de Distrito al albacea, en un procedimiento ex parte, sin oír a los herederos y sin el consentimiento de éstos, en nada aumenta la capacidad del albacea para otorgar la cancelación de una hipoteca o enajenar bienes inmuebles. No encontramos nada en el caso de *Aponte & Sobrino* v. *Sucn. Pérez*, que sea aplicable al de autos.

En el presente caso no se trata de la realización, por el albacea, de acto alguno de riguroso dominio sobre bienes in-

muebles o derechos reales de la herencia relicta. El albacea, presumiendo que la libreta en cuestión pertenecía al testador, incluyó en el activo de la herencia el saldo que en la misma aparecía. Convencido de su error y de que dicho saldo pertenecía al Sr. García, el albacea entregó el saldo a su dueño y notificó a los herederos y al Tesorero.

Aceptando, sin resolverlo, que un albacea no esté facultado para devolver a su legítimo dueño bienes muebles erróneamente inventariados como pertenecientes al testador, el hecho es que ante la Corte de Distrito, en un procedimiento en el cual eran partes todos los interesados en la herencia, el albacea ofreció prueba documental y testifical para demostrar que el saldo de $325.81 pertenece al tenedor de la libreta y no al testador.

Siendo la prueba ofrecida por el albacea suficiente para establecer el hecho de que la indicada suma no pertenece al caudal hereditario y sí a Inocencio García, y habiendo sido oídos los herederos opositores, quienes tomaron parte muy activa en el examen de los testigos, opinamos que la corte inferior erró al ordenar la restitución al caudal hereditario del saldo de la libreta.

En el Contrato Transaccional de septiembre 9, 1938 y en la Cuenta Final sometida por el albacea, se hizo constar que la acreencia que tenía el causante en la Sociedad Mario Mercado e Hijos ascendía a la suma de $413,064.63. En la cuenta final dicha suma aparece en la partida titulada "Traspaso del saldo de las cuentas de la herencia con Central Rufina".

Alegaron los opositores, que en la liquidación e imposición de la contribución por el Tesorero y en el recibo de la contribución de herencia, documentos que fueron admitidos en evidencia, la referida partida aparece con un saldo de $428,600.33, en vez de los $413,064.63 reportados en la cuenta final.

La corte inferior declaró con lugar la oposición, ordenando "que el albacea ponga en su cuenta final la suma de $428,600.33, en lugar de la suma de $413,064.63 que aparece en la cuenta final como crédito del causante contra la Sociedad Mario Mercado e Hijos". Alega el albacea apelante que dicha orden es errónea.

En el acto de la vista el albacea ofreció el testimonio del Sr. José Ramón Peralta, Administrador de la Central Rufina, quien declaró que la acreencia de don Mario Mercado, en la fecha de su muerte, ascendía a $428,600.33; que en septiembre de 1937, muerto ya don Mario, la Sociedad Mario Mercado e Hijos pagó al Tesorero de Puerto Rico la suma de $15,535.70, por concepto de contribuciones sobre ingresos adeudadas y no satisfechas por el testador al ocurrir su muerte; que al practicarse el inventario, después de hecho el pago de $15,535.70, dicha suma fué deducida de la acreencia de $428,600.33, quedando ésta reducida por virtud de dicho pago a la suma de $413,064.63, que fué la incluída por el albacea, de común acuerdo con los herederos, en el inventario que formó parte del Contrato Transaccional; que es cierto que en la notificación de defunción el albacea consignó como importe de la acreencia la suma de $413,064.63, pero en cambio no solicitó deducción alguna por concepto de los $15,535.70 satisfechos por Mario Mercado e Hijos a nombre y por cuenta de la Sucesión, con cargo a la acreencia original de $428,600.33; que al computar la contribución el Tesorero tomó la suma de $428,600.33 como importe del crédito en la fecha del fallecimiento del causante, pero incluyó y aceptó como una deducción del caudal los $15,535.70 del aludido pago de contribuciones sobre ingresos, imponiendo la contribución sobre $413,064.63 solamente.

En la liquidación practicada por el Tesorero (Ex. 25 del albacea) aparece entre los créditos personales del causante el siguiente: "De Mario Mercado e Hijos, $428,600.33". Entre las "Deducciones al Caudal Hereditario" figura la si-

guiente partida: "Deuda por concepto de Contribución Sobre Ingresos, $23,395.64". El albacea sostiene que en esa suma está incluída la de $15,535.70 envuelta en esta controversia.

El mismo testigo Sr. Peralta declaró que si se deduce del importe original de $428,600.33 la suma de $23,395.64, deducida por concepto de contribuciones sobre ingresos, el importe del crédito queda reducido a $405,204.69.

Creemos que existen razones suficientes para justificar una modificación de la orden recurrida, en el sentido que pasamos a indicar. Si en la fecha en que falleció don Mario Mercado la Sociedad Mario Mercado e Hijos le adeudaba $428,600.33, ésa y no otra es la cantidad que el albacea debió consignar en el inventario y en la notificación de defunción, como parte del Activo del caudal hereditario. Si después de ocurrido el fallecimiento del testador, la Sociedad deudora Mario Mercado e Hijos o el albacea pagaron, por cuenta de los herederos, las sumas que el testador adeudaba por concepto de contribuciones sobre ingresos, reduciendo, como consecuencia de ese pago, el montante del crédito en ese caso el albacea tiene derecho a cargar en el Pasivo de la herencia la suma realmente pagada al Tesorero por el indicado concepto de contribuciones sobre ingresos. Obligar al albacea a que ponga en su cuenta final la suma de $428,600.33, como crédito del causante contra Mario Mercado e Hijos, sin autorizarle al mismo tiempo a llevar al pasivo la reducción sufrida por dicho crédito, equivaldría a autorizar el injusto enriquecimiento de los herederos en la suma pagada para saldar una deuda del testador.

La orden recurrida debe ser modificada en el sentido de permitir al cuentadante que lleve al pasivo de su cuenta final la suma que, de acuerdo con la liquidación practicada por el Tesorero y los comprobantes en su poder, hubiere sido pagada al Tesoro Insular por contribuciones sobre ingresos

adeudadas por el testador en la fecha de su muerte. Y así modificada será confirmada.

 La Corte inferior sostuvo la impugnación de los opositores y ordenó al albacea cuentadante que "ponga en su cuenta final la cantidad de $6,481.06 en lugar de la suma de $4,942.04 que aparece en la Cuenta Final como *beneficios del causante por un mes y 22 días correspondientes al año 1937 a 1938"*, en la Sociedad Mario Mercado e Hijos.

Alega el albacea apelante que la cantidad realmente recibida por él, de la sociedad Mario Mercado e Hijos, fué la de $4,942.04 que figura en el Activo de su Cuenta Final; y que esa suma es el 30 por ciento que correspondía al testador en los beneficios de la Sociedad durante el año 1937–38, ascendentes a la suma de $16,473.46. Esta alegación aparece sostenida por la declaración del Contable Juan V. Díaz y por los libros de contabilidad del albaceazgo, de los cuales aparece ingresada la cantidad de $4,942.04.

La contención de los opositores es, que de acuerdo con el documento ofrecido por el propio albacea, el Tesorero computó la contribución de herencia sobre una partida de $6,481.06; que el albacea no hizo objeción alguna y pagó la contribución sobre dicha suma, y trata de cobrar a cada uno de los herederos la parte proporcional que le corresponde en el montante de la contribución; y que la actuación del cuentadante le impide presentar evidencia para alterar dicha partida.

Declaró el Sr. José R. Peralta, que la cifra de $6,481.06, computada por el Tesorero, es un mero estimado de lo que aumentó el capital de don Mario en la Sociedad, entre junio 30 de 1937, que es la fecha en que el testador rindió su última planilla de *income tax,* y agosto 22, 1937, fecha de su muerte; que los beneficios que correspondieron al albaceazgo, sobre el 10 por ciento de capital de don Mario, por el año económico que terminó el 30 de junio de 1938, ascendieron a $4,942.04, que es la cantidad realmente recibida por el ad-

ministrador y que fué distribuída, por cuartas partes, entre los cuatro herederos.

La prueba demuestra fuera de toda duda que la cantidad realmente recibida por el albacea fué la de $4,942.04. Esa es la suma que de acuerdo con la ley debe ser incluída por el albacea en su cuenta final. Artículo 587 del Código de Enjuiciamiento Civil (Ed. 1933) ; 21 Am. Jur. 662; *Mc Cauley's Estate,* 258 Pa. 502 (102 A. 136) ; *Fay* v. *Muzzey,* 13 Gray (Mass.) 53, 74 Am. Dec. 619.

Es errónea la orden recurrida en cuanto obliga al albacea a acreditar al Activo de la herencia una suma que excede en $1,539.02 a la recibida por él; y es injusta, porque permite el indebido enriquecimiento de los opositores en la indicada suma, que el albacea estaría obligado a reponer con cargo a su cuenta.

La orden en cuanto a esta partida se refiere debe ser revocada.

#### RECURSO DE LOS HEREDEROS OPOSITORES

Se basa este recurso en trece señalamientos, de los cuales discutiremos solamente los designados con los números I, II y IV y IX a XIII inclusive. Los cinco restantes han sido considerados y resueltos en la primera parte de esta opinión. .

■■■■■ I. La partida que aparece en la Cuenta Final bajo el título "Ayuda a Insolventes", por $5,721.52, fué aprobada. Alegan los opositores apelantes que la corte inferior erró al no condenar al albacea a reintegrar dicha suma al activo del caudal hereditario.

La oposición a dicha partida se basa en que la misma no constituye una carga testamentaria o deuda del causante ni fué reconocida por los herederos en el Contrato Transaccional.

Defendiendo sus actuaciones, alegó el albacea que en las cuentas trimestrales rendidas a los herederos se dió a éstos

toda la información necesaria; que todos los datos aparecen
en los libros y records del albaceazgo, los cuales han estado
siempre a la disposición de los opositores; que el testador
dedicaba parte de sus ingresos a socorrer a pobres e insol-
ventes y contrajo compromisos que el albacea de buena fe
ha cumplido; que hizo dichos pagos a insolventes, cumpliendo
instrucciones que el causante, quien era su padre, le diera
en diferentes ocasiones, para ayudar a ciertas personas que
por razón de su avanzada edad o enfermedad estaban físi-
camente incapacitadas para ganarse el sustento.

Al impartir su aprobación a esta partida, el juez senten-
ciador se expresó así:

"Don Mario Mercado Montalvo, movido por un espíritu de mera
liberalidad, por sentimientos de caridad cristiana y quizás conven-
cido íntimamente de que 'dar a los pobres es prestar a Dios, quien
devuelve ciento por uno', socorría económicamente a varias personas
insolventes, como las que fueron traídas a declarar en la vista de la
impugnación Núm. 2. El testador se comprometió con tales insol-
ventes a extenderles tal ayuda económica durante la vida natural
de los mismos. Su hijo el albacea Mario Mercado Riera, después
de la muerte del testador, continuó extendiendo esa ayuda económica
a dichos insolventes hasta llegar a la suma total de $5,721.52. 'La
liberalidad de por sí es causa suficiente de un contrato'. (*Cabani-
llas v. Cabanillas*, 33 D.P.R. 777, 779)."

Que las sumas cargadas por el albacea a la partida
"Ayuda a Insolventes", fueron realmente desembolsadas por
el albacea y pagadas a un número de ancianos e inválidos
a quienes el testador acostumbraba socorrer, es un hecho que
la corte inferior consideró claramente establecido por la evi-
dencia. Esta demuestra que el albacea, al enterarse de la
oposición de los dos herederos apelantes, en mayo de 1939
suspendió en algunos casos y redujo en otros la ayuda que
semanalmente enviaba a los protegidos del testador. No
está, pues, en controversia la honradez del albacea y sí su
facultad para hacer los mencionados pagos con cargo al cau-
dal hereditario.

No censuramos al juez sentenciador por su resolución del conflicto que le fué sometido por las partes. Obligado a decidir si el albacea, quien por ser hijo del testador creyó que el respeto que debía a la memoria de su padre le obligaba y le autorizaba, como albacea, para continuar, después de la muerte de su padre, las obras de caridad cristiana que éste solía hacer durante su vida, había procedido correctamente o si debía sostenerse la actitud estrictamente legal de los opositores, quienes protestaban de que sin su previo consentimiento se usaran fondos del caudal hereditario para tales donativos, negándose a ratificar, como pudieron haberlo hecho, el acto generoso, aun cuando fuera *ultra vires*, del hermano y albacea, parece natural que el sentenciador sintiese más simpatías por aquél que por amor a la caridad se olvidó de la ley.

Examinado el caso con frialdad y serenidad tenemos que convenir con los opositores apelantes en que los pagos hechos a insolventes e inválidos no constituían una carga testamentaria. Del testamento no aparece que el testador instituyera legado o disposición alguna en beneficio de pobres o insolventes indeterminados. En todos los legados y pensiones vitalicias instituídos por el testador aparecen los nombres de los beneficiarios, pero entre esos nombres no figuran los de las personas a quienes el albacea hiciera pagos después de la muerte del causante.

Los pagos que durante su vida y por pura generosidad hiciera don Mario Mercado a ciertas personas, no le obligaban, ni tampoco a sus herederos, a continuar haciéndolos después de su muerte.

La contención del albacea apelado de que al hacer dichos pagos a insolventes, los hizo obedeciendo instrucciones confidenciales que el testador le diera en diferentes ocasiones, no es sostenible en derecho, pues ello equivaldría a admitir la legalidad de los fideicomisos secretos, proscritos por el artículo 714, inciso 4 del Código Civil (1930), según el cual

no surtirán efecto: "Las (disposiciones) que tengan por objeto dejar a una persona el todo o parte de los bienes hereditarios para que los aplique o invierta según instrucciones reservadas que le hubiese comunicado el testador." Dictámenes de Maura, Vol. IV, págs. 163, 164.

 Tampoco es sostenible la teoría del albacea de que los hechos probados demuestran la existencia de un contrato de "renta vitalicia" por parte de·don Mario a favor de estas personas indigentes.

La "renta vitalicia" es un contrato aleatorio por el cual el deudor se obliga a pagar una pensión, durante la vida de una o más personas determinadas, por un capital en bienes muebles o inmuebles, cuyo dominio se le transfiere desde luego con la carga de la pensión. Artículo 1702, Código Civil, edición de 1930. "El contrato es más bien una donación o un legado, según se haga intervivos o mortis causa". Manresa, Vol. 12, ed. de 1907, pág. 61.

Además de la renta vitalicia establecida por título oneroso (Art. 1702, C. C., supra), la ley reconoce la·posibilidad de que la renta sea establecida por título lucrativo, por una determinada persona sobre sus propios bienes, teniendo en este caso el carácter de una donación o de una liberalidad hecha por el constituyente. 12 Manresa, Código Civil, Ed. de 1907, pág. 89. La renta vitalicia constituída a título gratuito deberá regirse por las reglas generales de las donaciones. 27 Enc. Jur. Española, pág. 220.

No apareciendo del testamento disposición alguna que autorice al albacea a hacer pago alguno a personas insolventes, ni que se haya gravado una propiedad inmueble para garantizar el pago de las rentas vitalicias que se ha pretendido establecer en este caso, éstas deben regirse por los preceptos legales aplicables a las donaciones intervivos de cosas muebles o título gratuito. Artículo 269 del Código Civil, 1930.

Dispone el artículo 574 del mismo Código Civil, que la donación de cosa mueble, como lo es el dinero, podrá hacerse verbalmente o por escrito, y, además:

"La verbal requiere la entrega simultánea de la cosa donada. Faltando este requisito, no surtirá efecto si no se hace por escrito y consta en la misma forma la aceptación."

De la prueba practicada resulta que el causante acostumbraba socorrer a un número de personas necesitadas, haciéndoles donativos de ciertas cantidades semanalmente. No se ha presentado en evidencia escrito o documento alguno por el cual se comprometiera el causante a continuar haciendo esos pagos semanales durante el término de su propia vida o durante la vida de cada uno de los donatarios. Y ya hemos visto que en su testamento no instituyó legado alguno ni afectó propiedad inmueble alguna para atender al pago de dichas dádivas después de su muerte. La donación que semanalmente hacía el causante a sus protegidos quedaba consumada por la entrega del dinero donado a cada uno de ellos. Una donación hecha verbalmente en las condiciones indicadas no lleva implícita promesa u obligación alguna de pagos futuros. 5 Manresa, Código Civil, 116, 118.

La corte inferior erró al no ordenar la restitución de la suma pagada. La resolución recurrida debe ser modificada en el sentido de ordenar la restitución del montante de dicha partida.

II. Se quejan los opositores apelantes de la aprobación por la corte inferior de la partida de $10,176.79, designada en las cuentas finales como "Becas a estudiantes pobres".

La oposición a dicha partida se basó en que a juicio de los opositores los egresos por el indicado concepto no son una carga testamentaria ni deuda hereditaria; que dichos pagos no fueron reconocidos por los herederos en el contrato transaccional ni en el inventario; y que el albacea no estaba

facultado por la ley ni por los herederos para hacer tales desembolsos.

La corte inferior, al aprobar la partida, declaró como hechos probados a su satisfacción que el causante envió por su cuenta a varios estudiantes necesitados o insolventes, de buena clasificación académica, y de buena conducta, a estudiar carreras en colegios de los Estados Unidos, asumiendo el causante la obligación de pagarles los gastos que tuvieren hasta terminar sus respectivas carreras; que el causante cumplió religiosamente dicha obligación hasta la fecha de su fallecimiento, dando instrucciones a su hijo, el albacea, para que continuara cumpliéndola después de su muerte; y que después del fallecimiento del testador el albacea continuó pagando las becas de los estudiantes, hasta una suma total de $10,176.79.

El testador, al enviar a los estudiantes a los centros educativos del continente, comprometiéndose a sostenerlos económicamente hasta que terminasen sus estudios aun cuando realizó un hecho lícito y puramente voluntario, al ser aceptada su promesa por los estudiantes, el testador quedó contractualmente obligado para con dichos jóvenes. Si el Sr. Mercado, después de haber contraído esa obligación y de haber dichos jóvenes comenzado sus estudios, se hubiese negado a continuar sufragando sus gastos, no hay duda en cuanto a que hubiera podido ser compelido a cumplir el contrato por él celebrado. Esa obligación de carácter puramente contractual del causante se trasmitió a sus herederos desde el momento de su muerte, conforme al artículo 610 del Código Civil (1930).

Por vía de ilustración haremos constar que la jurisprudencia americana resuelve casos similares al presente mediante la aplicación de la doctrina del "promissory estoppel".

Don Mario Mercado Montalvo no estaba obligado en manera alguna a proveer fondos para la educación de estos jóvenes estudiantes insolventes. El ofrecimiento que él les

hiciera, como acto voluntario y de mera liberalidad, podía haber sido retirado o revocado por él en cualquier momento antes de que los beneficiarios de tal promesa, confiando en ella, cambiaran su posición, perjudicándose al así hacerlo. Los jóvenes en este caso cambiaron de posición. Tuvieron fe en el hombre noble y generoso que les ofreció lo que sus padres no podían darles—una carrera. Tenían la firme creencia—y en ello no se equivocaron—de que el señor Mercado cumpliría su promesa y no les abandonaría a mitad del camino. E inspirados por esa fe en su protector lo renunciaron todo y fueron al Norte a estudiar y a demostrar, como demostraron, que eran dignos de la protección que se les ofreciera.

En *Matzger* v. *Arcade Bldg. & Realty Co.*, L.R.A. 1915A, 288 se expone la doctrina del *estoppel* así:

"El *estoppel* puede resultar solamente de palabras o actos que hayan inducido a otro a cambiar su posición con perjuicio para sí mismo, y que una persona razonable debió anticipar que habrían de producir tal resultado.

"La doctrina del estoppel se aplica no solamente para impedir a quien recibe y retiene un beneficio, que niegue la validez de la transacción de la cual recibió tal beneficio, sí que también para impedir a una de las partes en una transacción que niegue la validez de la misma cuando, si no se sostuviera como válida, la otra parte que ha actuado confiando en la actitud de la primera parte sería colocada en una posición materialmente peor, que la que de otro modo ocuparía."

Aplicando esta doctrina a hechos y circunstancias parecidos a los que estamos considerando, se ha resuelto que "una promesa de pagar a otra persona los gastos de un viaje a Europa, no relacionado en manera alguna con los negocios del que hizo dicha promesa, está basada en una causa suficiente; y si la persona a quien se hizo la oferta realiza dicho viaje, esa persona tiene derecho a recobrar el importe de sus gastos de aquél que prometió pagarlos". 12 Am. Jur., pág. 575, sec. 80.

"Este principio está también ilustrado por la reg'a de que una promesa, aun cuando sea hecha por un tercero, para inducir a una persona a contraer matrimonio, está basada en una causa suficiente, aun cuando no se le exija que se case con una persona determinada. Bajo un aspecto, el matrimonio con una persona de su elección puede ser un beneficio para aquél a quien se hiciera la promesa. Empero, como al contraer matrimonio él está haciendo algo que no está legalmente obligado a hacer, su cambio de posición es considerado por la ley como un detrimento." 12 Am. Jur. 575, sec. 80.

Se ha resuelto también que aun cuando la abstinencia del uso de tabaco o de licores intoxicantes puede ser realmente beneficiosa para una persona, el compromiso de abstenerse de usar tabaco o licor es causa suficiente para exigir el cumplimiento de una promesa. 12 Am. Jur., páginas 577–581. Numerosos son los casos en los cuales se ha sostenido que la persona que ha prometido contribuir con una cantidad determinada a una obra de caridad, está legalmente impedida (estopped) para alegar la falta de causa o consideración cuando se ha gastado dinero o contraído compromisos confiando en su promesa y el incumplimiento de ésta habría de causar perjuicios a la otra parte. 19 Am. Jur., pág. 659.

No hay duda alguna de que el incumplimiento de la promesa hecha por el causante a los estudiantes hubiera causado a éstos grandes e irreparables perjuicios. Los herederos estaban obligados a cumplir esa promesa como una carga hereditaria.

No erró la corte inferior al aprobar esta partida.

IV. La cuestión envuelta en este señalamiento se basa en los hechos siguientes:

Don Mario Mercado instituyó en su testamento varios legados de a $10,000 cada uno para sus nietos y biznietos. Entre esos legatarios no figura el nieto Adrián Vincenzo Mercado Jiménez, hijo del opositor Adrián Mercado Riera, por haber nacido con posterioridad al otorgamiento del testamento.

Por convenio entre los cuatro herederos, en el inventario únido al Contrato Transaccional se incluyó la suma de $10,000 a favor del menor, estipulándose en la Cláusula 3ª, inciso (j) de dicho contrato, que

"Los diez mil ($10,000) dólares consignados en el inventario para el menor hijo de don Adrián Mercado Riera, *estarán sujetos a las mismas condiciones a que se hallen afectos los legados hechos a nietos y biznietos en el testamento.*" (Bastardillas nuestras.)

La disposición testamentaria a que se hace referencia en la cláusula precedente, dice así:

"Designo a don Mario Mercado Riera *tutor* de todas las personas a quien anteriormente les he dejado legado, y que se encuentran comprendidas entre aquéllas sometidas a tutela, *y a los solos efectos de la administración de dichos legados.*" (Bastardillas nuestras.)

En las cuentas finales del albacea, bajo el rubro "Pagos hechos de plazos vencidos e intereses de legatarios", aparece una partida que dice así: "A Adrián V. Mercado Jiménez, $3,550." Dicha suma se consigna como pagada a Mario Mercado Riera por el primer plazo e intereses, sobre los $10,000 que aparecen en el inventario a favor del menor Mercado Jiménez.

Alegan los opositores que el citado menor no es un legatario y sí un beneficiario, por razón de la donación inter-vivos acordada en el contrato transaccional, supra; y que estando dicho menor bajo la patria potestad de su padre, el opositor Adrián Mercado Riera, el plazo vencido con sus intereses, así como los plazos futuros deben ser entregados al padre del menor beneficiario y no al tutor designado en el testamento para los legatarios "Sometidos a tutela". Pidieron los opositores que se ordenase al albacea entregar la suma de $3,550 al padre del menor. Insistió el albacea en que en su carácter de tutor, "y a los solos efectos de la administración" de los $10,000 donados al menor, es a él a quien corresponde recibir y administrar el fondo, de acuerdo

con lo dispuesto en las preinsertas cláusulas del contrato transaccional y del testamento. La corte a quo declaró sin lugar la oposición en los términos siguientes:

"La corte resuelve declararla sin lugar, por entender que su misión y jurisdicción están limitadas en este procedimiento únicamente a la aprobación de la Cuenta Final presentada por el albacea, sin que pueda resolver nada sobre cuestiones relativas a la tutela o patria potestad, en relación con el testamento, sobre el menor Adrián Mercado Jiménez."

La resolución recurrida es, en cuanto a este extremo, errónea. La misión de la corte de distrito en un procedimiento de esta naturaleza es la de examinar cuidadosamente todas y cada una de las partidas de la cuenta final que hubieren sido impugnadas, aprobándolas o rechazándolas según se ajusten o no a los preceptos de la ley, a las disposiciones testamentarias y a lo que hayan podido convenir los interesados en la herencia. (4)

El albacea, don Mario Mercado Riera, interpretando el testamento y el contrato transaccional en el sentido de que es a él a quien corresponde recibir y administrar los $10,000 donados al menor Adrián V. Mercado Jiménez, cargó en la cuenta final el importe del primer plazo e intereses recibidos por él por cuenta y para beneficio del menor. Los dos herederos opositores sostienen que el pago debió ser hecho por el albacea al padre del menor.

Tratándose como se trata de la aprobación o desaprobación de una partida de la cuenta final y teniendo ante sí a todas las partes interesadas—el albacea y tutor del menor y los cuatro herederos—no vemos razón alguna para que la corte a quo no pudiera proceder con plena jurisdicción a resolver si el importe de la partida en cuestión debía ser entregado al padre del menor o si el señor Mario Mercado Riera tenía derecho a recibir y administrar esa suma para beneficio del menor donatario.

(4) *Oronoz* v. *Román*, 26 D.P.R. 25; *Coll* v. *Rigo*, 16 D.P.R. 319; *Antonetti* v. *Foote*, 16 D.P.R. 591.

La cuestión a resolver no ofrece serias dificultades. En el contrato transaccional y en el testamento—que constituyen la ley entre las partes—debemos encontrar la solución.

Muerto el causante sin haber dejado disposición testamentaria alguna en favor del nieto póstumo, sus cuatro hijos y herederos, entre los cuales figura Adrián Mercado Riera, padre del menor, creyendo que era justo y razonable que éste recibiera una cantidad igual a la que por vía de legado habrían de recibir cada uno de los otros nietos y biznietos, acordaron entre sí consignar en el inventario una donación de $10,000 "para el menor hijo de Don Adrián Mercado Riera", con cargo al caudal hereditario. Es indudable que si los cuatro herederos donantes se hubiesen limitado a consignar dicha suma en el inventario, para el indicado fin, lo procedente sería ordenar al albacea la entrega de la suma donada y sus intereses al padre del menor, a quien, por tener la patria potestad sobre su hijo, correspondería la administración y custodia de sus bienes. Empero, los herederos donantes, entre ellos el propio padre del menor, deseosos de que el menor donatario quedase colocado en posición idéntica a la de los menores legatarios mencionados en el testamento, estipularon y convinieron (Cláusula 3ª, inciso (j), supra) en el contrato transaccional, que los diez mil dólares por ellos donados "estarán sujetos a las mismas condiciones a que se hallen afectos los legados hechos a nietos y biznietos en el testamento".

Ya hemos visto cuáles son las condiciones a que de acuerdo con el testamento, supra, se hallan afectos los legados hechos a nietos y biznietos. Todos los legatarios mencionados en el testamento, que fueren personas "que se encuentren comprendidas entre aquellas sometidas a tutela", o sea menores o incapacitados, quedan bajo la tutela de don Mario Mercado Riera, no en cuanto a sus personas y sí "a los solos efectos de la administración de dichos legados".

Tanto el albacea cuentadante como los herederos opositores admiten en sus respectivos alegatos que los $10,000 consignados en el inventario para ser pagados al menor Mercado Jiménez, con cargo al caudal hereditario, constituyen una donación entre vivos, puramente graciosa, hecha por los cuatro únicos y universales herederos del causante a favor del menor. Tratándose, pues, de una donación que ha de producir sus efectos entre vivos, ésta debe regirse por las disposiciones generales de los contratos y obligaciones en todo lo que no se halle determinado en el Título II "De la Donación" (Libro Tercero) del Código Civil. Artículo 563 del Código Civil de 1930.

La ley reconoce el derecho del donante a imponer condiciones y provee que "la donación será revocada a instancia del donante, cuando el donatario haya dejado de cumplir alguna de las condiciones que aquél le impuso". Artículo 589, Código Civil. En el presente caso, los cuatro donantes, estando capacitados para contratar y disponer de sus bienes y, por tanto, para hacer la donación bajo las condiciones que creyeren convenientes, acordaron y estipularon que la suma donada por los cuatro al menor no será entregada al donatario hasta que éste llegue a su mayor edad y que en el entretanto la suma donada quedará en poder de don Mario Mercado Riera para ser administrada y conservada para beneficio del donatario. El opositor don Adrián Mercado Riera, padre del menor y uno de los cuatro donantes, quien estipuló y aceptó las condiciones impuestas por los cuatro al hacer la donación, no tiene derecho a reclamar la suma donada y repudiar las condiciones. La obligación nacida del contrato transaccional, no siendo contraria a las leyes, a la moral ni al orden público, tiene fuerza de ley entre las partes contratantes y debe ser cumplida. Artículos 1044 y 1207 del Código Civil, edición de 1930.

Por las razones expuestas resolvemos que la partida en controversia debe ser aprobada.

IX. Los hechos que motivaron este señalamiento son, en síntesis, los siguientes:

Don Mario Mercado Montalvo era dueño de una cuenta personal de ahorros en la Sucursal del National City Bank of New York, en Ponce. El saldo de la misma ascendía en la fecha de su muerte, agosto 22 de 1937, a $201,871.02.

En abril 5, 1937, el señor Mercado personalmente extrajo de su referida cuenta la suma de $47,000. De acuerdo con sus instrucciones el Banco transfirió los $47,000 a su oficina central en San Juan para ser entregados al administrador de Mario Mercado e Hijos, don José R. Peralta. La suma fué entregada el mismo día a Peralta y a Pastor Mandry, Jr., contra recibo del primero por cuenta de la Sociedad "Mario Mercado e Hijos". Al día siguiente, Peralta y Mandry ofrecieron a Elvira Olivieri Cummins y a los Lluveras, de Yauco, la suma de $45,359.50, con motivo de la prioridad que la Sociedad Mario Mercado e Hijos alegaba tener para la compra de ciertos terrenos. Habiéndose negado la Sra. Olivieri y los Lluveras a aceptar él dinero, el Sr. Mandry radicó una demanda ante la Corte de Distrito de Ponce, a nombre de la mencionada Sociedad y consignó allí la indicada suma.

En el inventario practicado para ser unido al contrato transaccional, el albacea no incluyó el alegado crédito por $45,359.50 a favor del causante y en contra de Mario Mercado e Hijos, pero se estipuló expresamente que se considerarían inventariados cuantos créditos, derechos y acciones aparecieren o se descubrieren en lo sucesivo, de la pertenencia del causante. En la notificación de defunción enviada al Tesorero, el albacea incluyó como propiedad del causante el saldo que aparecía en la libreta de la cuenta de ahorros, por $201,871.02; y sobre esa suma pagó la contribución de herencia.

El Sr. Mario Mercado Riera, además de ser albacea y director gerente de Mario Mercado e Hijos, fué quien sus-

cribió y juró la demanda sobre consignación de los $45,359.50 en Corte; pero ni en los libros de la sociedad ni en los del albaceazgo, se hizo anotación alguna con respecto a dicha consignación.

Solicitaron los opositores que se ordenase al albacea que incluyera en sus cuentas finales el importe del referido crédito, más sus intereses. Se opuso el albacea, alegando que la corte inferior carecía de jurisdicción, dentro de este procedimiento de rendición de cuentas finales, para resolver que Mario Mercado e Hijos le adeuda o no le adeuda a la sucesión de don Mario Mercado, y por concepto de préstamo, la suma de $45,359.50. La corte resolvió que carecía de jurisdicción para decidir la cuestión planteada por los opositores, porque "ha quedado convencida de que, al resolver la oposición adicional letra (a), necesaria e inevitablemente tendrá que resolver sobre el título; es decir, si los $45,359.50 eran, o no, de don Mario Mercado Montalvo cuando se sacaron del National City Bank para consignarse por la Sociedad Mario Mercado e Hijos"; y porque este incidente no es el apropiado para establecer título de propiedad a favor o en contra de un tercero, "que en este caso sería la Sociedad Mario Mercado e Hijos, la que no está sometida a la jurisdicción de esta Corte en el presente incidente".

Sostienen los opositores apelantes que la resolución recurrida es errónea y debe ser revocada.

Los hechos anteriormente expuestos están sostenidos por la evidencia sometida por los opositores, la cual no fué controvertida sino más bien reforzada por la presentada por el albacea. El propósito de los opositores al presentar tal evidencia no fué el de solicitar una sentencia por la que se condenara a Mario Mercado e Hijos a pagar a la Sucesión Mercado la suma prestada por don Mario a la Sociedad para ser consignada. Para eso no tenía jurisdicción la corte inferior, toda vez que Mario Mercado e Hijos no era parte en el

procedimiento ni había quedado sometida en manera alguna a la jurisdicción de la corte.

Empero, los opositores tenían derecho a ofrecer prueba tendiente a demostrar que ciertos fondos que pertenecían al causante personalmente fueron prestados por éste a la Sociedad Mario Mercado e Hijos, para que ésta pudiese hacer la consignación ante la Corte. Siendo la prueba presentada suficiente para establecer, prima facie, la obligación de Mario Mercado e Hijos de devolver la suma prestádale, a don Mario Mercado o a sus herederos, la corte inferior tenía jurisdicción para ordenar al albacea que incluyera el alegado crédito como parte del activo del caudal hereditario. La mera inclusión del alegado crédito, en el inventario de los bienes relictos, no lesiona derecho alguno de la Sociedad Mario Mercado e Hijos, presunta deudora, pues ésta tendrá oportunidad de defenderse y de ser oída cuando el adjudicatario o adjudicatarios del alegado crédito traten de hacerlo efectivo por la vía judicial. El único efecto de la inclusión del crédito en el inventario es sentar la base para que aquél a quien le fuere adjudicado pueda reclamar su pago.

Hemos estudiado cuidadosamente toda la prueba. La consideramos amplia y suficiente para establecer, prima facie, el derecho de los herederos opositores a que se incluya en el inventario, como *chose in action* perteneciente a la Sucesión, el derecho a reclamar la devolución del alegado préstamo.

La resolución recurrida debe ser revocada y en su lugar se ordenará la inclusión del alegado crédito en el inventario y en las cuentas finales del albacea.

X. Los opositores apelantes solicitaron la inclusión en las cuentas finales del albaceazgo de la suma de $5,250, que figura en los libros de Mario Mercado e Hijos bajo el título ''Fondo Panteón de Familia''. La corte inferior de-

negó la inclusión solicitada. Alegan los apelantes que tal resolución es errónea. Veamos los hechos.

A la señora doña Eufemia Riera Dubocq le fué concedida una indemnización por los daños que sufriera como consecuencia del hundimiento del vapor "Carolina", torpedeado por un submarino alemán en 1917. Después de haber fallecido dicha señora, su viudo don Mario Mercado recibió la suma de $4,608.96 en pago de los $3,000 de indemnización, más los intereses. La Corte de Distrito de Ponce designó al viudo como administrador de dicha suma, la cual fué depositada en el Banco de Ponce en cuenta titulada "Mario Mercado y Familia". En junio 22, 1931, cuando el depósito ascendía a $5,250, el administrador lo retiró del Banco y lo trasladó a la Sociedad Mario Mercado e Hijos, en cuyos libros aparece anotado bajo la partida "Fondo Panteón Familia", haciéndose constar en el *voucher* que el dinero procedía de "efectivo entregado por don Mario Mercado Montalvo para arreglo y terminación del panteón de la Familia".

La resolución recurrida, en su parte dispositiva, dice así:

"Cuando se percibió el montante de la indemnización por el hundimiento del vapor 'Carolina', el señor Mario Mercado Montalvo estaba vivo y su esposa había muerto; al tiempo de ocurrir el hundimiento del Carolina, la señora Eufemia Riera Dubocq estaba casada con el señor Mario Mercado Montalvo, y la indemnización fué concedida por 'daños, sufrimientos físicos y daños materiales' (*sic*) de la señora Eufemia Riera Dubocq.

"No cabe duda alguna de que la indemnización percibida pertenecía *a la sociedad de gananciales* (Artículos 1301 y 1307 del Código Civil, ed. 1930; *Vázquez* v. *Valdés*, 28 D.P.R. 467; y numerosos casos resueltos por la Corte Suprema de Puerto Rico.)

"Los cuatro hijos del matrimonio, como herederos, son los únicos y exclusivos dueños de los $5,250, importe de la indemnización, suma que está depositada en la Sociedad Civil Mario Mercado e Hijos, la que está formada hoy por los mismos cuatro herederos.

"La Corte entiende, y así lo declara, que esa suma, como perteneciente a los herederos, debe figurar entre los bienes a repartir en el Inventario General de los bienes hereditarios, y debe ser entregada,

por la Sociedad Mario Mercado e Hijos, que la tiene en depósito, tan pronto como sea requerida para ello. (Artículos 1,666 y 1,675 del Código Civil, ed. 1930).

"Pero, resolviendo ahora la Oposición Adicional Letra (F) en relación con la Cuenta Final del Albacea, la Corte entiende, y así lo resuelve, que "dicha suma de $5,250, nunca ha sido entregada a. Mario Mercado Riera en su carácter de Albacea de Mario Mercado Montalvo, y que, por consiguiente, no procede incluirla en la Cuenta Final del Albaceazgo. (Artículos 54 y 55 de la Ley de Procedimientos Legales Especiales, contenidos en los artículos 587 y 588 del Código de Enjuiciamiento Civil, ed. 1933.)

"Por tanto, la Corte entiende que debe declarar y por la presente declara sin lugar la Oposición Adicional Letra (F)''. (T. de A., págs. 90–93.)

La resolución recurrida es errónea en parte y debe ser modificada.

Si la suma de $5,250 pertenecía, como correctamente sostuvo la corte inferior, a la sociedad de gananciales que existió entre don Mario Mercado y su esposa, al quedar disuelta la sociedad por muerte de la esposa, una mitad de dicha suma pasó a ser propiedad de sus cuatro herederos, como parte de su herencia materna, pasando la otra mitad a ser propiedad del viudo don Mario Mercado Montalvo, como su participación en la disuelta sociedad de gananciales. Al fallecer don Mario, la mitad que le correspondiera pasó por partes iguales a sus cuatro herederos. Son, pues, los cuatro herederos dueños de la totalidad de la indemnización, una mitad por herencia materna y la otra mitad como parte de la herencia paterna.

El albacea cuentadante no puede ser obligado a consignar en sus cuentas la mitad de la indemnización correspondiente a los cuatro herederos como herencia materna, toda vez que esa mitad no forma parte del caudal hereditario de don Mario Mercado Montalvo. Pero sí puede y debe ser obligado a incluir en el inventario y en su Cuenta Final la mitad de la indemnización que, como su participación en los gananciales, correspondía al causante.

La resolución recurrida debe ser revocada. En su lugar debe ordenarse al albacea cuentadante que incluya en el inventario y en su Cuenta final un crédito por la suma de $2,625 o sea la mitad que correspondía al causante en la partida "Fondo Panteón Familia", que aparece en los libros de Mario Mercado e Hijos con un total de $5,250.

▮▮▮ XI. Refiérese este señalamiento a la negativa de la corte inferior a ordenar al albacea que incluyera en el activo de su cuenta final la suma de $1,750.26, en vez de la de $1,350 asentada por él bajo la partida "Beneficios pendientes de pago a favor del causante por el Bazar Atocha, Inc., en agosto 22, 1937, fecha del fallecimiento".

La evidencia en relación con esta partida es contradictoria. La corte inferior resolvió el conflicto decidiendo que la suma realmente recibida por el albacea por el indicado concepto fué la de $1,350, que aparece incluída en las cuentas finales bajo consideración. No vemos razón alguna que pudiera justificar nuestra intervención. La decisión en cuanto a esta partida será confirmada.

▮▮▮ XII. La corte inferior, después de resolver las impugnaciones a la Cuenta Final, terminó su opinión, diciendo:

"La Corte es de opinión, que debe dictarse una Resolución con carácter de Auto Definitivo, haciendo en la Cuenta Final del Albacea las modificaciones y alteraciones resueltas en la presente Relación del Caso y Opinión; Disponiendo la Corte que, con arreglo a derecho y justicia, se adjudique el sobrante que resultare, en dinero o en fincas, entre las personas con derecho a ello, o sean los cuatro herederos del causante, etc.".

Sostienen los opositores apelantes que la disposición que antecede es errónea en cuanto por ella se ordena la distribución o adjudicación de bienes raíces pertenecientes al caudal hereditario; que ante la corte inferior no se planteó ni se sometió a su decisión cuestión alguna relacionada con los bienes raíces; y que lo único que se sometió a la decisión del juez inferior, fué la corrección de la Cuenta Final ren-

dida por el albacea, "en cuanto a la indebida inclusión u omisión de fondos, gastos y accesiones de los bienes, y la distribución correspondiente del saldo que a favor de unos u otros pudiese resultar de tal cuenta final".

Tienen razón los opositores apelantes. En el contrato transaccional celebrado entre los cuatro herederos se estipuló:

"(g) *Los frutos, rentas y productos, o cualesquiera otras accesiones de los bienes relictos,* serán objeto de la correspondiente rendición de *cuenta final* por el Albacea a los demás herederos, y *el saldo* que resultare *será distribuído por cuartas partes* entre los susodichos cuatro herederos del causante." (Bastardillas nuestras.) (Cláusula 3ª, subdivisión (g)).

La distribución y adjudicación de las fincas fué acordada por los herederos en la Cláusula 3ª, párr. (*f*) del Contrato Transaccional, que dice:

"*Los demás bienes* de la Sucesión de don Mario Mercado Montalvo, según resultan del susodicho inventario, y los que puedan aparecer después de la pertenencia del causante, *se entenderán y quedan adjudicados* por partes iguales entre los cuatro herederos. . . , tratando los herederos en todo momento de evitar la continuación de la Comunidad."(Bastardillas nuestras).

La adjudicación previa de los bienes, hecha por los mismos herederos por virtud del Contrato Transaccional, fué reconocida por esta Corte en *Mercado* v. *Corte,* 62 D.P.R. 368, 389–90. No era, pues, necesario disponer, como se dispuso en la resolución recurrida, la adjudicación de fincas que ya los herederos se habían adjudicado por partes iguales.

La resolución recurridá debe ser modificada en el sentido de limitar sus efectos a la distribución entre los cuatro herederos del sobrante que resultare en dinero, o en créditos o derechos de acción que no hubieren sido ya adjudicados por virtud del Contrato Transaccional.

XIII. No estamos convencidos de que la corte inferior abusara de su discreción al no condenar al ex albacea cuen-

tadante a pagar, con cargo a su cuenta particular, las costas y honorarios de abogados de los opositores.

*La resolución recurrida será modificada de acuerdo con lo expuesto en esta opinión y así modificada será confirmada.*

El Juez Asociado Sr. Córdova no intervino.